742 F.2d 94
 35 Fair Empl.Prac.Cas. 1133, 19 Ed. Law Rep. 904
 Harry T. KRYNICKY, Jr., Appellant,
v.
UNIVERSITY OF PITTSBURGH, Wesley W. Posvar, Paul N.
Robinson, Rhoten A. Smith, Donald N. Henderson,
Robert Nossen, Appellees.
Rosemary SCHIER, Appellee,
v.
TEMPLE UNIVERSITY, Appellant.
 Nos. 83-5471, 84-1077.
 United States Court of Appeals,
Third Circuit.
 Argued April 23, 1984.
Decided Aug. 23, 1984.
As Amended Sept. 28, 1984.
 
 Michael P. Malakoff, Ellen M. Doyle (argued), Berger, Kapetan, Malakoff & Meyers, Pittsburgh, Pa., for appellant Harry T. Krynicky, Jr., No. 83-5471.
 James J. Restivo, Jr. (argued), Michael J. Betts, Reed, Smith, Shaw & McClay, Ronald F. Talarico, University of Pittsburgh, Counsel's Office, Pittsburgh, Pa., for appellees, No. 83-5471.
 Robert J. Reinstein, Eleanor W. Myers, Temple University, Philadelphia, Pa., amicus curiae, Temple University, No. 83-5471 and for appellant, No. 84-1077.
 Marcy D. Colins (argued), Philadelphia, Pa., for appellee Rosemary Schier, No. 84-1077.
 Before ADAMS and BECKER, Circuit Judges, and SAROKIN, District Judge*.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 These consolidated appeals present the question whether the recent Supreme Court decisions in Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); and Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), in effect overruled this court's decision in Braden v. University of Pittsburgh, 552 F.2d 948 (3d Cir.1977) (in banc ), which held that the University of Pittsburgh (and by implication Temple University) are "state actors" for purposes of 42 U.S.C. Sec. 1983.
 
 
 2
 The district courts reached differing results. In Krynicky the district court concluded that the Lugar trilogy had undermined Braden, and held that, because the Commonwealth of Pennsylvania had not participated with the University of Pittsburgh in making the faculty tenure decision challenged by Krynicky, the University's decision was not subject to the constraints of the fourteenth amendment. In Schier the district court reached the opposite result, holding that Braden was still controlling, and that the Commonwealth had so far insinuated itself into the operation of Temple University that the institution was subject to the mandates of the fourteenth amendment in connection with Schier's claim of retaliatory discharge.
 
 
 3
 Because we believe that Braden has not been overruled by the Lugar trilogy, we reverse in Krynicky and affirm in Schier.
 
 I. FACTUAL AND PROCEDURAL HISTORY
 A. Krynicky
 
 4
 Harry Krynicky, an Assistant Professor of English at the University of Pittsburgh, brought suit against the University and various administrative officials under 42 U.S.C. Sec. 1983, alleging that he had a "property" and "liberty" interest in his employment contract within the meaning of the fourteenth amendment, and that the University infringed those interests when it failed to notify him in a timely fashion of its decision to deny him tenure. In addition, Krynicky alleged that the tenure process generally denied him due process, and that the decision to deny him tenure was made in retaliation for his outspoken criticism of the University administration and his unorthodox teaching methods.[1] The linchpin of Krynicky's claim for purposes of this appeal is that the University's actions were taken "under color of state law" within the meaning of Sec. 1983 because of the relationship between the Commonwealth of Pennsylvania and the University.
 
 
 5
 The University and the individual defendants moved for summary judgment, but did not contest the existence of state action in the motion. The district court granted the motions in part. 560 F.Supp. 803.[2] Defendants then amended their answer to assert that there was no state action as required by Sec. 1983, and again moved for summary judgment. The district court thereupon granted the motion as to the remaining claims, stating that the reasoning of Rendell-Baker and Blum essentially superseded the Third Circuit's analysis in Braden, and that, therefore, Braden did not control. The court held that "the receipt of revenue from the state, membership of state nominees on the University's Board of Trustees, and statutory recognition that the University is part of the state's system of higher education are not sufficient to make the University's employment policies state decisions." Krynicky v. University of Pittsburgh, 563 F.Supp. 788, 789 (W.D.Pa.1983).
 
 B. Schier
 
 6
 Rosemary Schier, who was an employee of Temple University Hospital from September 1979 through September 3, 1981, brought suit against the University alleging that during the course of her employment, she was discriminated against on grounds of her sex, and that her supervisor had sexually harassed her, had retaliated against her for having filed internal complaints, and had forced her to sign a resignation memorandum. Schier sought relief under 42 U.S.C. Sec. 1983 and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e.
 
 
 7
 At the close of discovery, Temple moved for summary judgment on all claims, asserting that the Title VII claim was time-barred and that Schier had not presented any facts to support her claim that Temple had acted under color of state law for the purposes of Sec. 1983. The district court granted summary judgment on Schier's Title VII claim, but denied Temple's motion on the Sec. 1983 claim, holding that, under the symbiotic relationship test for state action articulated in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the state had a sufficiently close relationship with Temple that actions taken by Temple were subject to constitutional scrutiny under section 1983. In reaching its decision, the district court considered the applicability of the Lugar trilogy to its decision, but concluded that Blum and Rendell-Baker did not overrule Burton, and that, therefore, the Third Circuit's opinion in Braden was still good law. Schier v. Temple University, 576 F.Supp. 1569 at 1578 (E.D.Pa.1984). However, recognizing that another district court in the circuit had reached the opposite result in the Krynicky case, the court certified for interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(b) the question "whether, for the purposes of 42 U.S.C. Sec. 1983, acts performed by employees of a statutorily designated 'state-related' institution of higher education such as Temple University constitute 'state action.' " We agreed to hear the appeal.
 
 II. DISCUSSION
 
 8
 A. The State Action Requirement and the State Action Tests
 
 
 9
 The fifth and fourteenth amendments protect individuals only from governmental action. In order for Krynicky or Schier to benefit from these constitutional protections, they must show that the alleged violations of due process and freedom of speech are "fairly attributable to the state." Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982). The "state action requirement" preserves "individual freedom by limiting the reach of federal law and federal judicial power" and avoids "imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." Lugar, 457 U.S. at 936, 102 S.Ct. at 2754.
 
 
 10
 The requirement of section 1983 that the challenged activity be taken "under color of state law"[3] has been treated as identical to the "state action" element of the fourteenth amendment. Lugar, 457 U.S. at 929, 102 S.Ct. at 2750; Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 n. 7, 90 S.Ct. 1598, 1606 n. 7, 26 L.Ed.2d 142 (1970). What constitutes sufficient state participation to attribute activity to the state under section 1983 has proved to be an extremely difficult question. It has variously been characterized as "murky waters," Fitzgerald v. Mountain Laurel Racing, Inc., 607 F.2d 589, 591 (3d Cir.1979), cert. denied, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 814 (1980); "obdurate," Braden v. University of Pittsburgh, 552 F.2d 948, 955 (3d Cir.1977); and a "protean concept," Magill v. Avonworth Baseball Conference, 516 F.2d 1328, 1331 (3d Cir.1975) (quoting Lewis, "The Meaning of State Action," 60 Colum.L.Rev. 1083, 1085 (1960)).
 
 
 11
 The Supreme Court to date has not developed a uniform test for ascertaining when state action exists and has stated that no such unitary test is possible. Reitman v. Mulkey, 387 U.S. 369, 378, 87 S.Ct. 1627, 1632, 18 L.Ed.2d 830 (1967). Instead, the Court has adopted a number of approaches whose application depends upon the circumstances. The Court has suggested that lower courts investigate carefully the facts of each case. Burton, 365 U.S. at 722, 81 S.Ct. at 860. Two of the approaches are relevant to these appeals: the "symbiotic relationship" test and the "nexus" test.[4]
 
 
 12
 In Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the Supreme Court found state action where there was a "symbiotic relationship" between the acting party and the state.[5] The Court held that state action exists when:
 
 
 13
 The State has so far insinuated itself into a position of interdependence with ... [the acting party] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.
 
 
 14
 Id. at 725, 81 S.Ct. at 862. In Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the Court held that state action may also exist when the state becomes sufficiently involved in the particular challenged activity.[6] The Court suggested that in considering the state action issue, the "inquiry must be whether there is a sufficiently close nexus between the state and the challenged action of the ... entity so that the action of the latter may be fairly treated as that of the State itself." Jackson, 419 U.S. at 351, 95 S.Ct. at 453.
 
 
 15
 In Braden v. University of Pittsburgh, 552 F.2d 948 (3d Cir.1977), we confronted the question whether the University of Pittsburgh acted under the color of state law with respect to a claim almost identical to that of Ms. Schier. We rejected Pitt's contention that Jackson had overruled Burton, stating:
 
 
 16
 Based on a review of the Supreme Court's opinion in Jackson, we believe that that decision would not preclude application of the precepts of Burton here, should the appropriate state-private relationship exist. Instead of overruling Burton, the Jackson Court merely distinguished the earlier opinion, finding "absent in [Jackson] the symbiotic relationship presented in Burton ..."
 
 
 17
 Braden, 552 F.2d at 957, citing Jackson, 419 U.S. at 357, 95 S.Ct. at 456. Based on the provisions of University of Pittsburgh-Commonwealth Act, Pa.Stat.Ann. tit. 24, Secs. 2510-201 to 211, we concluded that Pennsylvania had so far insinuated itself into a position of interdependence with the University of Pittsburgh that there was a symbiotic relationship between the two, and we therefore held that the actions of the University could fairly be attributed to the state for purposes of satisfying the state action requirement of section 1983.
 
 
 18
 Unless Braden has been overruled by the Supreme Court's recent Lugar trilogy, it is binding precedent for the proposition that the University of Pittsburgh and the Commonwealth of Pennsylvania are involved in a "symbiotic relationship,"[7] and therefore, that the actions of the University are actions taken under color of state law for purposes of section 1983. Moreover, since the Temple University-Commonwealth Act, which sets out the relationship between Temple and the State, is virtually identical to University of Pittsburgh-Commonwealth Act, which was the basis for our conclusion in Braden that Pitt and the Commonwealth have a symbiotic relationship, there can be no doubt that, if Braden has not been overruled, it requires the conclusion that the actions of Temple, like Pitt, are actions taken under color of state law.
 
 
 19
 Pitt and Temple make two arguments in support of their contention that Braden has been overruled:
 
 
 20
 (1) the Lugar trilogy overruled or, at a minimum, limited Burton v. Wilmington Parking Authority to its facts, and therefore Braden, which relies on Burton, is no longer good law; and
 
 
 21
 (2) even if the symbiotic relationship test remains viable, the Lugar trilogy has clarified that test and, as a result, it is now clear that the Third Circuit in Braden misapplied Burton when it concluded that a symbiotic relationship existed between Pitt and the Commonwealth.
 
 
 22
 We consider these arguments in turn.
 
 
 23
 B. The Impact of the Lugar Trilogy on Burton[8]
 
 
 24
 In Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), teachers who were discharged from the New Perspectives School, a non-public school, because they had opposed school policies and threatened to form a union, brought suit under 42 U.S.C. Sec. 1983, alleging violations of their constitutional rights under the first, fifth, and fourteenth amendments. The plaintiffs cited several factors that allegedly supported attribution of the New Perspectives School's actions to the state. First, the New Perspectives School, which specializes in dealing with students who have difficulty completing high school, receives nearly all its students from referrals by various city school committees or from a state drug rehabilitation program. Second, the referring school committee pays for the student's education; consequently, the school receives almost 100 percent of its funding from the state. Third, in order to receive the tuition funding, the school must comply with various regulations created by the State, including some general administrative guidelines on personnel policies such as the type of records that must be kept. Rendell-Baker v. Kohn, 457 U.S. at 833, 102 S.Ct. at 2767.
 
 
 25
 Despite the presence of these factors offered to support state action, the Supreme Court held that the actions of the New Perspectives School could not be attributed to the state under Sec. 1983. In reaching this determination, the Rendell-Baker Court first applied the nexus test of Jackson and determined that the state had not "compelled or even influenced by any state regulation" the decision to fire the plaintiffs. Rendell-Baker, 457 U.S. at 841, 102 S.Ct. at 2771. The Court then considered the assertion that the New Perspectives School met the symbiotic relationship test as set forth in Burton:
 
 
 26
 In Burton, the Court held that the refusal of a restaurant located in a public parking garage to serve Negroes constituted state action. The Court stressed that the restaurant was located on public property and that the rent from the restaurant contributed to the support of the garage. Burton, [365 U.S.] at 723, 81 S.Ct., at 860. In response to the argument that the restaurant's profits, and hence the State's financial position, would suffer if it did not discriminate, the Court concluded that this showed that the State profited from the restaurant's discriminatory conduct. The Court viewed this as support for the conclusion that the State should be charged with the discriminatory actions. Here the school's fiscal relationship with the State is not different from that of many contractors performing services for the government. No symbiotic relationship such as existed in Burton exists here.
 
 
 27
 Id. 457 U.S. at 842-43, 102 S.Ct. at 2772. After finding that the New Perspectives School failed the "public function" test as well, id. at 842, the Court held that there was no state action, and consequently that no claim for relief under 42 U.S.C. section 1983 was stated.
 
 
 28
 Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), also involved a suit under section 1983. The plaintiffs alleged violations of due process in the decision of a "Utility Review Committee" of The American Nursing Home in New York City to transfer Medicaid patients from high-care to lower-care facilities pursuant to federal regulations. The Supreme Court once again utilized the nexus test and failed to find state action, stating that there was no evidence that the State had "exercised coercive power or ... provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Blum, 457 U.S. at 1004, 102 S.Ct. at 2786. The Court then applied the Burton symbiotic relationship test. It rejected the contention that state licensing and funding converts private action into state action, stating:
 
 
 29
 As we have previously held, privately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit of Burton. That programs undertaken by the State result in substantial funding of the activities of a private entity is no more persuasive than the fact of regulation of such an entity in demonstrating that the State is responsible for decisions made by the entity in the course of its business.
 
 
 30
 Id. at 1011 (citations omitted). Finding that the American Nursing Home also failed to perform a function "traditionally the exclusive prerogative of the State," id. at 1011, citing Jackson v. Metropolitan Edison Co., 419 U.S. at 353, 95 S.Ct. at 454, the Court again concluded that there was no state action.
 
 
 31
 Lugar v. Edmondson Oil Co., Inc., the final member of the trilogy, did not have occasion to discuss the Burton symbiotic relationship test, and, therefore, that case is not directly relevant to the present discussion. However, it is significant to note that the Court did cite Burton in a footnote in Lugar without giving any indication that it had been overruled. See Lugar, 457 U.S. at 938 n. 19, 102 S.Ct. at 2754 n. 19.
 
 
 32
 As is apparent from the preceding discussion, the Supreme Court in the Lugar trilogy clearly treated the symbiotic relationship test as a viable framework of analysis, but concluded that Burton was inapposite to the factual scenarios of those cases. The only indicia of state involvement in Rendell-Baker and Blum were financial assistance and routine state regulation. By comparison, in Burton the state was much more intertwined with the Eagle Coffee Shop: the shop was located in a state-owned building; the state maintained the facility and made all necessary repairs; and the coffee shop and the state conferred mutual benefits on each other because of their location. Thus, we reject Temple and Pitt's assertion that Rendell-Baker and Blum eliminate the Burton symbiotic relationship test.
 
 
 33
 C. The Impact of the Lugar Trilogy on Braden
 
 
 34
 Alternatively, Pitt and Temple argue that Blum and Rendell-Baker preclude the finding of a symbiotic relationship unless it can be shown that the state benefits financially from the activities of the defendant. Such a financial relationship was present in the Burton case, but was not proved in Braden, and was not, the defendants contend, demonstrated here. Thus, the defendants argue that although Burton may still be good law after the Lugar trilogy, Braden has implicitly been overruled and we should find that there is no symbiotic relationship in the cases of Pitt and Temple.
 
 
 35
 It is true that the Supreme Court in Blum and Rendell-Baker focused on the financial relationship between the defendants and the State, but that was because the financial relationship was the only significant form of state influence over the defendants in those cases. The Court concluded that merely proving the existence of the limited type of financial relationship present in those cases was not sufficient to establish the requisite symbiotic relationship. By way of contrast, the Court in Burton emphasized the complete intermingling of state and private actions that were present in that case as grounds for its conclusion that a symbiotic relationship existed. The court referred to fact that the state-owned Parking Authority financially benefited from renting to the coffee shop, but the Court also emphasized that the coffee shop was located in a building owned and operated by the State. It is apparent from the opinion that this second factor is at least as important as the financial relationship.
 
 
 36
 The Commonwealth's interrelationship with Pitt and Temple in these cases is more closely analogous to the complete intermingling of state and private actors found in Burton than to the relatively minimal interrelationship between the State and the defendants in Blum and Rendell-Baker. An examination of the statutes that create and define the Commonwealth's relationship with Pitt and Temple demonstrates this fact. Cf. Pa.Stat.Ann. tit. 24, Secs. 2510-1 to 11 (Temple University-Commonwealth Act), Pa.Stat.Ann. tit. 24, Secs. 2510-201 to 211 (University of Pittsburgh-Commonwealth Act). Since the two statutes are virtually identical, we will refer specifically only to the University of Pittsburgh statute.
 
 
 37
 To begin with, the statute was enacted to save the Commonwealth the expense of creating an additional state college.[9] In addition, the statute changes the name of the University of Pittsburgh to "The University of Pittsburgh--Of the Commonwealth System of Higher Education." Pa.Stat.Ann. tit. 24, Sec. 2510-203 (Purdon 1966). Consonant with this linkage, the legislature declares it to be the purpose of the Act to extend the opportunities for higher education in the Commonwealth "by establishing University of Pittsburgh as an instrumentality of the Commonwealth to serve as a State-related institution in the Commonwealth System of higher education." Pa.Stat.Ann. tit. 24, Sec. 2510-202 (Purdon 1966) (emphasis added). This same section also provides:
 
 
 38
 That the Commonwealth of Pennsylvania recognizes University of Pittsburgh as an integral part of a system of higher education in Pennsylvania, and that it is desirable and in the public interest to perpetuate and extend the relationship between the Commonwealth of Pennsylvania and University of Pittsburgh for the purpose of improving and strengthening higher education by designating University of Pittsburgh as a State-related university.
 
 
 39
 Pa.Stat.Ann. tit. 24, Sec. 2510-202 (Purdon 1966).
 
 
 40
 The statute also furnishes the "nuts and bolts" of this linkage. It provides that one-third of the University's trustees are to be selected by the Commonwealth, Pa.Stat.Ann. tit. 24, Sec. 2510-204(b) (Purdon 1966), and that the Governor of Pennsylvania, the Mayor of the City of Pittsburgh, and the Superintendent of the Department of Public Instruction are trustees ex officio.[10] Pa.Stat.Ann. tit. 24, Sec. 2510-204(a) (Purdon 1966). The Act provides that the Commonwealth will make annual appropriations to the University, to be used as specified by the state, and that the appropriated funds must be kept in a specific account. Pa.Stat.Ann. tit. 4, Sec. 2510-207 (1966).[11] The state may further set tuition and fee schedules for Pennsylvania students in the annual appropriation act. Pa.Stat.Ann. tit. 24, Sec. 2510-206 (1966).
 
 
 41
 The Act also mandates that the University "file with the General Assembly and with the Auditor General of the Commonwealth, a statement setting forth the amounts and purposes of all expenditures made from both the Commonwealth Appropriation Account and other University accounts during the fiscal year." Pa.Stat.Ann. tit. 24, Sec. 2510-207 (Purdon 1966). The statute entitles the University to benefit from all Commonwealth programs for capital development, Pa.Stat.Ann. tit. 24, Sec. 2510-208 (Purdon 1968), and creates a state tax exemption for income derived from bonds issued by the University and loans secured by its mortgages. Pa.Stat.Ann. tit. 24, Sec. 2510-209 (Purdon 1966). Finally, the Chancellor of the University must file annually a report of all University activities, "instructional, administrative and financial," with the Board of Trustees who "shall transmit [the report] to the Governor and to the members of the General Assembly." Pa.Stat.Ann. tit. 24, Sec. 2510-210 (Purdon 1966).
 
 
 42
 The logic of Rendell-Baker and Blum is that state contributions to otherwise private entities, no matter how great those contributions may be, will not of themselves transform a private actor into a state actor. In the cases of Pitt and Temple, to the contrary, the issue is not whether the level of state contributions has reached a magic figure necessary to effect this transformation, but rather the affirmative state act of statutorily accepting responsibility for these institutions. This fact, above all, marks the difference between these two institutions and those discussed by the Supreme Court in Rendell-Baker and Blum.
 
 
 43
 In addition, unlike the school in Rendell-Baker and the nursing home in Blum, Temple and Pitt are not merely private contractors with the state. Not only do they receive present financial support, but also the state has committed itself to future financial aid and sets an annual appropriation policy and tuition rate. There is nothing to indicate that the state could not discontinue its support of the New Perspectives School or the American Nursing Home at any time by the simple means of not renewing their contracts. By contrast, it would require a legislative enactment to disentangle Temple and Pitt from the Commonwealth, and the idea that legislative appropriations to these institutions might be severely curtailed is unrealistic. Cf. Pa.Stat.Ann. tit. 24, Sec. 2510(b). Furthermore, neither of the institutions in Rendell-Baker or Blum had to submit to state-sponsored audits or make yearly reports to the State Assembly. Finally, unlike the institutions in Blum and Rendell-Baker, one-third of the Trustees of Pitt and Temple are now appointed by the state. Temple and Pitt are not merely "private constractors performing services for the government," Rendell-Baker, 457 U.S. at 843, 102 S.Ct. at 2772; they not only receive funding and are subject to routine state regulations, but are instrumentalities of the state, both in name and in fact.
 
 
 44
 In sum, we see nothing in either Blum or Rendell-Baker that conflicts with Braden or its rationale, and, therefore, we conclude that the Supreme Court did not overrule our decision in Braden.[12]
 
 III. CONCLUSION
 
 45
 We hold that the Supreme Court's recent decisions in the so-called Lugar trilogy do not overrule either the Supreme Court's decision in Burton v. Wilmington Parking Authority or our opinion in Braden v. University of Pittsburgh. Therefore, we are bound by Third Circuit precedent to hold that a "symbiotic relationship" exists between the Commonwealth of Pennsylvania on the one hand and Pitt and Temple on the other. Actions taken by those two institutions are, therefore, actions taken under color of state law and are subject to scrutiny under section 1983. Consequently, we will reverse the judgment of the district court in Krynicky v. University of Pittsburgh and affirm the judgment of the district court in Schier v. Temple University, and will remand both cases for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable H. Lee Sarokin, United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 Krynicky asserted several pendent state law claims along with his Sec. 1983 claims. These included breach of contract, intentional interference with a contractual relationship, and intentional infliction of emotional distress
 
 
 [2]
 With respect to the due process claims under Sec. 1983, defendants asserted that the University had provided Krynicky with complete procedural due process prior to the challenged employment decisions and that, furthermore, as a matter of law, Krynicky had no "property or liberty" right in continued employment at the University. With respect to the first amendment claim under Sec. 1983, they asserted that it was barred by the applicable statute of limitation. The district court granted the motion as to the due process claim but denied it as to the first amendment claim, stating that the cause of action was not time-barred
 With respect to the state-law claims, the defendants asserted that under University regulations, Krynicky had received notice within the specified time period and had failed to exhaust all internal University procedures and remedies before filing the suit. They also asserted that the emotional distress claims were time-barred. The district court granted the defendants' motion on these two claims.
 
 
 [3]
 42 U.S.C. Sec. 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [4]
 The other tests are the "public function" test and the "state compulsion" test. "Public function" analysis has been applied in three different situations: first, when the government, after performing a particular function, attempts to avoid its constitutional obligations by transfering the function to a private entity, see Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); second, in cases involving the exercise of powers, such as the supervision of elections that are almost always carried out by government, see Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); and third, in the first amendment context to determine if private property is the functional equivalent of a municipality. Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). The "state compulsion" analysis has been used in cases where the state, by its law, has compelled a particular act, see, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 170, 90 S.Ct. 1598, 1615, 26 L.Ed.2d 142 (1970); Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963)
 
 
 [5]
 In Burton, plaintiffs brought suit under 42 U.S.C. Sec. 1983, alleging that the Wilmington Parking Authority, a state entity, was responsible for the racially discriminatory practices of a privately owned coffee shop located in a building owned by the authority. In the lease between the coffee shop and the Authority, the shop had agreed to abide by all applicable laws, statutes, ordinances, rules, and regulations of any federal, state, or municipal authority. The Authority, in turn, agreed to provide all maintenance and upkeep of the premises and to make any necessary structural or exterior repairs
 
 
 [6]
 Jackson concerned a privately owned and operated utility. The plaintiff, a customer, alleged a violation of due process when the utility terminated her electric service without notice, a hearing, or any opportunity to pay the past due amounts. In the particular case, the Supreme Court held that the Commonwealth of Pennsylvania was not sufficiently involved in the particular challenged activity to convert it into state action
 
 
 [7]
 The statute analyzed in Braden continues in effect at this time
 
 
 [8]
 In Community Medical Center v. Emergency Medical Services of Northeastern Pennsylvania, Inc., 712 F.2d 878 (3d Cir.1983), which was decided subsequent to the Lugar trilogy, we stated that Rendell-Baker and Blum treat Jackson and Burton as viable frameworks of analysis. However, inasmuch as this statement was arguably dictum because the challenged entity in Community Medical Center failed every test for state action, we must reach the question, fairly presented by the contentions of Pitt and Temple in this case, whether Burton, which undergirds Braden, is still a viable framework of analysis
 
 
 [9]
 As we stated in Braden:
 [P]rior to adoption of the Act, the University desparately needed a source of funds to maintain its operations. The situation was described by Pitt officials and trustees as grave. At the same time, the Commonwealth desired to satisfy the needs of the populace for expanded facilities for higher education. As the existing state educational institutions were insufficient to satisfy the public demand, and because the creation of new state universities would have been extremely expensive, the decision was made to incorporate established, but financially ailing private institutions into the Commonwealth system of higher education. The state thus was able to satisfy the educational needs of its citizens at a cost considerably lower than would have been entailed by the creation of wholly new institutions. Concomitantly, Pitt was able to survive as an institution of higher education, even though it may have been forced to relinquish its traditional autonomy as a private facility.
 Braden, 552 F.2d at 961 (footnotes omitted).
 
 
 [10]
 In the Temple statute, the Mayor of Philadelphia, rather than the Mayor of Pittsburgh, is an ex officio trustee. Pa.Stat.Ann. tit. 24, Sec. 2510-4(a) (1965)
 
 
 [11]
 For example, for the fiscal year July, 1982 through June, 1983, the General Assembly appropriated $78,235,000 to the University of Pittsburgh
 
 
 [12]
 Temple and Pitt also argue that, under state law precedent, the state courts have declared them to be private entities despite their statutory relationship with the state. In support of this contention, they cite Mooney v. Board of Trustees of Temple University of Commonwealth System of Higher Educ., 448 Pa. 424, 292 A.2d 395 (1972), a case decided five years before Braden, which held that the Temple University-Commonwealth Act did not convert Temple into a public agency for the purposes of the Pennsylvania Inspection and Copying Records Act. Mooney, however, is inapposite to this case. The Mooney court specifically stated that the statute in question did not "transform Temple into a state agency for purposes of the Inspection and Copying Records Act." Mooney, 448 Pa. at 434, 292 A.2d at 401 (emphasis added). Its determination, therefore, only governs cases involving that Act. More importantly, a state court construction of a state statute has no bearing on whether an entity that is connected with the state is a "state actor" for purposes of the fourteenth amendment and Sec. 1983
 Temple also argues that this court recognized the authoritativeness of Mooney in Philadelphia National Bank v. United States, 666 F.2d 834 (3d Cir.1981), cert. denied, 457 U.S. 1105, 102 S.Ct. 2904, 73 L.Ed.2d 1314 (1982), where we held that Temple was not an "agency" of the Commonwealth for the purposes of Sec. 103(a)(1) of the Internal Revenue Code, 26 U.S.C. Sec. 103(a)(1) (1976). While it is true that we considered Mooney in our analysis, we specifically noted the distinction between what constitutes a "state agency" and what constitutes "state action":
 On the other hand, such cases as Henderson v. Fisher, 631 F.2d 1115 (3d Cir.1980); Braden v. University of Pittsburgh, 552 F.2d 948 (3d Cir.1977); and Isaacs v. Board of Trustees of Temple University--of the Commonwealth System of Higher Education, 385 F.Supp. 473 (E.D.Pa.1974), which explore whether activities of state-related universities are "state action" within the ambit of 42 U.S.C. Sec. 1983, are of little assistance here. In those cases, the issue was whether a sufficient symbiotic relationship existed between the school and the Commonwealth so that there was liability for civil rights violations.
 Philadelphia National Bank, 666 F.2d at 839.