**Chalmers EDWARDS, Plaintiff,**

v.

**LUTHERAN SENIOR SERVICES OF DOVER, INC., a Delaware corporation, and Raymond C. Best, individually and in his official capacity as President of Lutheran Senior Services of Dover, Inc., Defendants.**

**Civ. A. No. 83–356 MMS.**

United States District Court,
D. Delaware.

Feb. 21, 1985.

Harold Schmittinger, and William D. Fletcher, Jr., Schmittinger & Rodriguez, P.A., Dover, Del., for plaintiff.

F. Alton Tybout, and Anne L. Naczi, Tybout, Redfearn, Casarino & Pell, Wilmington, Del., Peter S. Feliceangeli, Twilley, Jones & Feliceangeli, Dover, Del., for defendants.

MURRAY M. SCHWARTZ, District Judge.

In June, 1981, plaintiff Chalmers A. Edwards was fired from his job as Executive Director of Luther Towers, a low and moderate income housing development. Edwards then instituted this action for reinstatement and damages under 42 U.S.C. § 1983 against Lutheran Senior Services of Dover, Inc. ("LSS"), which owns and operates Luther Towers, and Reverend Raymond C. Best, the president of LSS. Edwards claims that his dismissal deprived him of property and liberty without due process in violation of the Fourteenth Amendment. He also asserts pendent state law claims for breach of contract and defamation.

Defendants assert that a prerequisite to Edwards' section 1983 claim is that defendants acted "under color of" state law when they fired him, because section 1983 only remedies wrongs that are fairly attributable to the state. Defendants have moved for summary judgment on this claim, alleging, *inter alia,* that section 1983 does not apply to them because their actions are not state actions.[1] Because the determination of state action requires "sifting facts and weighing circumstances," *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961), the material facts are set forth in detail below.

### I. *Background*

The relevant facts are either undisputed or, if disputed, are set forth as alleged by the plaintiff, the party against whom summary judgment is sought. The Delaware legislature has declared the provision of decent housing affordable by low and moderate income people to be a public purpose and has authorized the Delaware State Housing Authority ("DSHA") to issue bonds to finance an increase in the supply

---

**1.** Defendants have also raised several other grounds for disposing of the federal and state claims. In light of the disposition of the state action issue, it is unnecessary to address those other arguments.

of this housing. 31 *Del.C.* §§ 4068, 4053. To carry out this purpose, DSHA provides funds to "housing sponsors," which are individuals or entities that DSHA determines to be qualified to "own, construct, acquire, rehabilitate, operate, manage or maintain a housing development," subject to DSHA regulation. 31 *Del.C.* § 4069(9). Defendant LSS was incorporated as a non-profit Delaware corporation in June, 1979, for the purpose of providing housing for low and moderate income persons. DSHA designated LSS to be a housing sponsor and, on December 18, 1979, approved a thirty-year mortgage loan of $5,558,245 to LSS to construct Luther Towers. LSS used this money, along with ten thousand dollars of its own money, to acquire land and build the development. LSS is expected to obtain funds to repay the construction loan and cover operating expenses from the rents it receives from tenants and from "section 8" payments from the United States Department of Housing and Urban Development ("HUD").[2] These section 8 payments are channeled to LSS through DSHA, which acts as agent for HUD.

As a condition of the loan, DSHA required LSS to agree to the extensive restrictions embodied in the Mortgage Agreement, Regulatory Agreement and Building Loan Agreement, all executed contemporaneously by DSHA and LSS on December 18, 1979, and in the Management Agreement.[3] The agreements allow DSHA extensive oversight of the operation and management of Luther Towers. DSHA approval is required for all plans and drawings for Luther Towers, for the form of the leases used by LSS, and for the rental rates for all residential units. Tenants for the residential units must be selected in accordance with guidelines specified by DSHA. The agreements also require LSS to seek section 8 housing payments and to take all necessary steps to insure that the payments continue. LSS is required to submit its operating budget each year for approval by DSHA, and to make all books and documents available for a proper audit at any time. Further, LSS must submit a financial statement each year that is prepared by a DSHA-approved accountant.

DSHA's supervisory authority over personnel matters is less extensive than its authority over financial matters. Although DSHA established a minimum number of employees of Luther Towers, including an Executive Director, and specified their salaries, the Management Agreement specifically reserves for LSS the power to "hire, pay, supervise, and discharge all managerial and non-managerial personnel." D.I. 38A, Item 5, § 601. LSS is not required to consult with DSHA before making personnel changes.

DSHA does have potentially greater supervisory powers over the development if LSS violates any provision of the Regulatory Agreement, or if DSHA "deems itself to be insecure with respect to the Mortgage Loan" because of an LSS violation of any agreement with DSHA, 31 *Del.C.* Chapter 40, or any DSHA rules and regulations promulgated under that statute. D.I. 38A, Item 2, at 20–21, 24–25. If the violation is not corrected to DSHA's satisfaction within thirty days, DSHA may remove any or all of the officers or directors of LSS and appoint others.[4] DSHA appointees

---

2. These payments are provided pursuant to section 8 of the United States Housing Act of 1937, as amended by the Housing and Community Development Act of 1974 and codified at 42 U.S.C. § 1437f.

3. The Management Agreement is a DSHA form contract that specifies how the development is to be managed. Although it was referred to in the Regulatory Agreement, neither LSS nor DSHA ever signed the Management Agreement. Affidavit of John Gorlich, Docket Item ("D.I.") 45. However, since the parties briefed and argued this motion assuming that the Manage-

ment Agreement was in effect, and since the plaintiff has stressed some of its provisions as showing the connection between the state and LSS, the Court will assume for the purposes of this motion that the Management Agreement in the record is valid and binding.

4. The Regulatory Agreement gives DSHA several alternatives to replacing officers and directors. It can sue for specific performance or request the court to appoint a receiver to take over and operate Luther Towers. DSHA can instead take possession of the project itself and collect rents and operate the project until DSHA, in its dis-

would then serve until the violation is corrected or until DSHA is assured that similar violations will not recur. However, DSHA has never attempted to appoint or remove any officers or directors of LSS, and no DSHA representatives have served on the LSS Board of Directors.

Plaintiff's association with LSS began when he was hired as Executive Director by the LSS Board in December, 1980, shortly after Luther Towers opened. Defendants soon became dissatisfied with plaintiff's performance of his duties, and the Board established a personnel committee in May, 1981, which discussed and evaluated plaintiff's job performance without his knowledge or presence. On June 16, 1981, the committee decided that plaintiff should be fired. Before the full Board met, however, Reverend Best notified DSHA that Edwards would be fired. On June 23, 1981, the Board accepted the personnel committee's recommendation, then called plaintiff in and fired him. Two months after the firing, the Board gave plaintiff a post-termination hearing and reaffirmed its decision to dismiss plaintiff. Thereafter, plaintiff brought this action under 42 U.S.C. § 1983 and state law, contending, *inter alia,* that he was terminated without due process in violation of the Fourteenth Amendment.

## II. *State Action Analysis*

Defendants contend that plaintiff's 42 U.S.C. § 1983 claim is not viable because the firing did not involve state action.[5] The Fourteenth Amendment only prohibits deprivations of property or liberty caused by state action. Section 1983, which allows private persons to enforce their constitu-

tional rights, only provides a right of action if the defendant was acting under color of state law. Since LSS is a private corporation, a threshold question is whether its actions in dismissing plaintiff can be considered the actions of the state.

The requirement of section 1983 that an action be under color of state law has been interpreted as identical to the state action requirement of the Fourteenth Amendment. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929, 102 S.Ct. 2744, 2750, 73 L.Ed.2d 482 (1982); *Krynicky v. University of Pittsburgh,* 742 F.2d 94, 97 (3d Cir. 1984), *petition for cert. filed,* 53 U.S.L.W. 3530 (U.S. Jan. 22, 1985) (No. 84–1017). In general, the state action doctrine requires that the conduct of the defendants be fairly attributable to the state. *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2754. However, no single standard has evolved for determining what level of state involvement in an activity is sufficient to require a finding of state action. Instead, the Supreme Court has applied a variety of state action tests while cautioning the lower courts to investigate carefully the facts and circumstances of each case. *See Krynicky,* 742 F.2d at 97–98; *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

Two of the tests for state action are relevant in this case [6]—the "nexus" test of *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), and the "symbiotic relationship" test of *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The nexus test requires a showing that the private entity is pervasively regulated by the state and that

---

cretion, determines that LSS is in a position to operate the development in accordance with the Regulatory Agreement, Mortgage Note, and Mortgage. D.I. 38A, Item 2, at 20.

**5.** Plaintiff's other constitutional claim is that certain statements made in connection with his firing damaged his reputation, also in violation of the Fourteenth Amendment. Plaintiff has not contended, however, that this constitutional claim requires a separate state action analysis from the firing without due process claim. The

state action analysis used for the employment termination claim is equally applicable to the defamation claim, and the holding below that no state action was involved in Edwards' firing also disposes of the defamation claim.

**6.** Plaintiff has not alleged that the two other state action tests—the "state compulsion" test and the "public function" test—are applicable. *See Krynicky v. University of Pittsburgh,* 742 F.2d at 98 n. 4.

" 'there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.' The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) (citation omitted) (quoting *Jackson*, 419 U.S. at 351, 95 S.Ct. at 453).

In order to find state action based on the nexus test, the Court would have to find a sufficient connection between the state and the challenged action—the decision to fire plaintiff. However, DSHA's involvement in plaintiff's firing was minimal. DSHA officials do not review LSS hiring or firing decisions, do not set standards of competency for employees, and did not participate in any of the meetings which led to plaintiff's discharge. Nonetheless, plaintiff points to two possible connections between the state and the firing decision.

■ First, plaintiff states that DSHA officials were apparently upset when LSS accepted the resignation of plaintiff's predecessor and hired plaintiff without first notifying DSHA. As a result, Reverend Best informed DSHA after the personnel committee decided to recommend discharging plaintiff but before the meeting of the full Board. Plaintiff contends that Reverend Best felt compelled to consult with DSHA before making personnel changes. At most, however, the evidence cited by plaintiff shows that DSHA officials required LSS to notify them of personnel changes, not that DSHA was in any way involved in personnel decisions. Both Reverend Best and DSHA officials stated that DSHA was notified only as a courtesy and that DSHA expressed neither approval nor disapproval of the firing of Edwards.[7] Mere notification given to the state of a decision made by a private party, without more, is inadequate to show a nexus be-

tween the state and the decision. *See Blum v. Yaretsky*, 457 U.S. at 1010, 102 S.Ct. at 2789; *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 n. 6, 102 S.Ct. 2764, 2770 n. 6, 73 L.Ed.2d 418 (1982). Moreover, nothing in the agreements requires LSS to consult with DSHA before making personnel changes or authorizes DSHA to demand such consultation. The lack of such authorization militates against a finding of state action. *See Rendell-Baker v. Kohn*, 457 U.S. at 838 n. 6, 102 S.Ct. at 2770 n. 6; 641 F.2d 14, 27–89 (1st Cir.1981).

■ Plaintiff also cites the provisions of the agreements which allow DSHA to remove officers or directors of LSS if LSS violates the agreements or the state's rules and regulations. However, DSHA's power to make personnel changes is contingent and does not exist until LSS commits a violation. More importantly, there is no evidence that DSHA has ever used this power or that it was used in this instance. The existence of potential, unexercised power is insufficient to demonstrate a nexus between the state and the firing decision. *Cf. Rendell-Baker v. Kohn*, 641 F.2d 14, 24–25 (1st Cir.1981) (latent power of state to control private school by cutting off funding is inadequate to support a finding of state action under the symbiotic relationship test), *aff'd*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). Thus, there is no evidence that the state was responsible for the decision to fire Edwards, and the nexus test for state action is not satisfied.

Plaintiff's primary contention is that a "symbiotic relationship" exists between the state and DSHA. In *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the Supreme Court found that the action of a private entity was state action when "[t]he State ha[d] so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity." *Id.* at 725, 81 S.Ct. at 862. Defendants contend, how-

---

7. Deposition of Raymond C. Best, D.I. 42A, at 94; Affidavit of John Gorlich, D.I. 44, Item A-1-A, at 3–4; Affidavit of Lynne Bie, D.I. 44, Item A-1-C, at 3.

ever, that the symbiotic relationship test established in *Burton* has been severely circumscribed by the Supreme Court's subsequent decisions in *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), and *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). This contention warrants a review of the facts of *Burton* and subsequent cases in order to determine the scope of the symbiotic relationship test.

In *Burton,* a black man challenged the discriminatory actions of the Eagle Coffee Shoppe, a privately owned restaurant which leased space in a parking facility owned and operated by the state. The Supreme Court found that the restaurant's location conferred on the state and the restaurant a variety of mutual benefits— for example, diners were afforded a convenient place to park, which may have increased the demand for the state's parking facilities. Furthermore, the restaurant maintained that it would lose business if it had to serve blacks, which meant that "profits earned by discrimination ... are indispensable elements in ... the financial success of a governmental agency." 365 U.S. at 724, 81 S.Ct. at 861. Noting that its holding was dependent upon the particular facts before it, the Court held that state action existed. *Id.* at 726, 81 S.Ct. at 862.

The more recent Supreme Court decisions neither overrule *Burton* nor limit *Burton* to its facts, *see Krynicky,* 742 F.2d at 99–101, but they do provide further guidance as to what facts amount to state action. In *Rendell-Baker,* staff members who had been discharged by the New Perspectives School brought suit under section 1983. New Perspectives School was a private, nonprofit institution which specialized in dealing with students who had difficulty completing public high school and which received nearly all of its students by referrals from city and state agencies. These referrals were made pursuant to a Massachusetts statute which required school committees to identify students with special needs and develop suitable educational programs for them in either private or public schools. New Perspectives School also re-

ceived well over 90% of its funding from government sources and was subject to "detailed regulations concerning matters ranging from record-keeping to student-teacher ratios." 457 U.S. at 833, 102 S.Ct. at 2767. The state also required the school to maintain written job descriptions and written statements describing personnel standards and procedures.

Plaintiff Rendell-Baker had been hired under a federal grant distributed through the State Committee on Criminal Justice. As a condition of the grant, this committee had to approve the eventual hiring decision, although its review was limited to determining that the hiree had the requisite qualifications. When Rendell-Baker was fired, she complained to the committee, which demanded that the school provide a written explanation of the discharge. When the school complied, the committee notified the school that it was satisfied with the explanation.

The Court held that these facts were insufficient to support a finding of state action. The Court distinguished *Burton* on the grounds that the restaurant in *Burton* was located on public property and the state benefited financially from the restaurant's discriminatory practices. In *Rendell-Baker,* by contrast, because the school was located on private land, and "the school's fiscal relationship with the State [was] not different from that of many contractors performing services for the government," no symbiotic relationship existed. *Rendell-Baker,* 457 U.S. at 843, 102 S.Ct. at 2772.

In *Blum v. Yaretsky,* decided on the same day as *Rendell-Baker,* Medicaid patients challenged under the due process clause decisions to transfer them from a high-care facility to a low-care facility. The transfer decisions were made by physicians and administrators employed by private nursing homes. However, the state required the nursing homes to fill out patient care assessment forms in making decisions to transfer patients. The state also subsidized the operating and capital costs

of the nursing homes, licensed the homes, and paid the medical expenses of more than 90% of the patients. The Supreme Court found that these facts did not satisfy the symbiotic relationship test:

> [P]rivately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit of *Burton.* That programs undertaken by the State result in substantial funding of the activities of a private entity is no more persuasive than the fact of regulation of such an entity in demonstrating that the State is responsible for decisions made by the entity in the course of its business.

*Id.* at 1011, 102 S.Ct. at 2789 (citation omitted).

The Third Circuit Court of Appeals recently applied the *Burton* symbiotic relationship test, as modified by *Rendell-Baker* and *Blum,* to find that a state-supported university was a state actor. In *Krynicky v. University of Pittsburgh,* 742 F.2d 94 (3d Cir.1984), *petition for cert. filed,* 53 U.S.L.W. 3530 (U.S. Jan. 22, 1985) (No. 84–1017), an assistant professor at the University of Pittsburgh who had been denied tenure brought suit against the university under section 1983, alleging denial of due process. Defendants contended that *Rendell-Baker* and *Blum* limited the symbiotic relationship test to situations in which the state benefits financially from the activities of the defendant. The Third Circuit noted that the Supreme Court in *Rendell-Baker* and *Blum* had focused on the financial relationship between the defendant and the state, but found that this "was because the financial relationship was the only significant form of state influence over the defendants in those cases." *Krynicky,* 742 F.2d at 101. The court interpreted *Burton* as emphasizing "the complete intermingling of state and private actions" and found that the restaurant's location on public property was "at least as important as the financial relationship" to the finding of state action. 742 F.2d at 101.

The court went on to hold that the facts of *Krynicky* were more similar to *Burton* than to *Rendell-Baker* or *Blum.* First, the court noted that the statute which initiated state support for the university was enacted to save the state the expense of creating an additional state college. Second, the statute described the university as an "instrumentality" of the state and changed the name of the university to identify its connection with the state system of higher education. Third, the statute provided that the state would select one-third of the trustees of the university. Finally, the court attached particular significance to the statutory requirement that the state make annual appropriations for the university. By contrast, the state could discontinue at any time its support of the institutions in *Rendell-Baker* and *Blum.* The *Krynicky* court found that this "affirmative state act of statutorily accepting responsibility" for the university was the most important distinction from *Rendell-Baker* and *Blum.* 742 F.2d at 102.

■ To summarize, *Rendell-Baker* and *Blum* reaffirm that extensive state regulation and funding are, by themselves, insufficient to establish a symbiotic relationship. Instead, a court must find stronger indicia of state-private interdependence, such as location on public property or a statutorily-created continuing relationship, in order to hold that state action exists.

Plaintiff argues that several facts, taken together, show a symbiotic relationship exists between LSS and the state. First, plaintiff contends that the state circumscribes LSS's decisionmaking freedom through the Regulatory Agreement, Building and Loan Agreement, and Management Agreement, which allow DSHA to determine, *inter alia,* the design of Luther Towers, the rents paid by tenants, the terms of leases, and the salaries paid to employees. Second, LSS promotes a public purpose identified by the Delaware legislature, because it provides moderately priced housing to low and middle income persons. Third, because LSS contributed only $10,-000 in assets to the $5.5 million mortgage

loan from DSHA, plaintiff avers that LSS owed its existence to state action. Fourth, the continuing financial success of the project depends on its receipt of government subsidies. Fifth, as was discussed above in connection with the nexus test, LSS notified DSHA officials about the firing of Edwards, and DSHA had the potential power to take over the management of Luther Towers if LSS violated the agreements. Finally, the state benefited financially from LSS because DSHA used mortgage payments to retire bonds.

■ These factors, when analyzed, do not demonstrate that a symbiotic relationship exists. The restrictive provisions in the agreements constitute nothing more than an extensive system of regulation. LSS does serve a public purpose, but virtually every recipient of public funds who is given money for a specific reason serves a public purpose. The third factor—the large percentage of LSS's assets that are derived from public funds—is no different than the financial relationship in *Rendell-Baker*, where the school received over 90% of its funding from the government, 457 U.S. at 832, 102 S.Ct. at 2767, or *Blum*, where the state subsidized "practically all of the operating and capital costs of the facility, and [paid] the medical expenses of more than 90% of its residents." 457 U.S. at 1027, 102 S.Ct. at 2798 (Brennan, J., dissenting). The fact that the project's success depends upon government funding is also no different than the dependence of the private entities in *Rendell-Baker* and *Blum* on government funding; moreover, unlike *Krynicky*, the continuing governmental funding that Luther Towers receives comes from the federal government, not the state government. In marked contrast to *Krynicky*, in which the state legislature was committed to continuing appropriations, the state government does not control LSS's funding and has little say in its continuation.

Concerning the fifth factor, as was discussed above in connection with the nexus test, the notice given to DSHA of the firing of Edwards does not demonstrate significant state involvement with LSS. The potential power of the state to take over the management of LSS does not bear on state action until that power is actually exercised. *See Rendell-Baker v. Kohn*, 641 F.2d 14, 25 (1st Cir.1981), *aff'd*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). This potential power differs little from the power sometimes reserved by commercial mortgagees to take over the management of mortgaged property if the mortgagee's security interest is threatened.

The final factor cited by plaintiff—the mortgage payments made to DSHA—is not dispositive, as the state receives mortgage payments and other revenues from a wide variety of private entities which are not considered state actors. In an attempt to analogize this case to *Burton*, plaintiff argues that the proper management of Luther Towers financially benefits DSHA because it promotes the full utilization of the rental units and therefore ensures that DSHA receives money from HUD and full mortgage payments. Thus, plaintiff argues, because the firing related to the management of Luther Towers, and that management "directly benefit[s], in some financial capacity, the state," *Thompson v. Community Action of Greater Wilmington, Inc.*, 567 F.Supp. 1159, 1164 (D.Del. 1983), a symbiotic relationship exists. Plaintiff's argument is unpersuasive. The Court in *Burton* concluded that the state was benefiting financially from discrimination because defendant contended discrimination was essential for the profitable operation of its business. Unlike *Burton*, plaintiff has brought forward no facts to buttress its sheer speculation that the state benefited financially from Edwards' firing. Upon examination, the factors cited by plaintiff reduce themselves to LSS receiving extensive state financial support and being subject to extensive regulation. The previous discussion establishes that this is not enough to establish a symbiotic relationship. The Supreme Court's decisions in *Rendell-Baker* and *Blum* compel the conclusion that the firing of Edwards cannot be "fairly attributed to the state," and state action does not exist.

Plaintiff also cites cases from other circuits holding that eviction by landlords of urban redevelopment projects is state action. *See McQueen v. Druker,* 438 F.2d 781 (1st Cir.1971); *Lopez v. Henry Phipps Plaza South, Inc.,* 498 F.2d 937 (2d Cir. 1974); *Joy v. Daniels,* 479 F.2d 1236 (4th Cir.1973). Those cases were decided, however, before the Supreme Court's decisions in *Rendell-Baker* and *Blum* made clear that extensive state financial support and funding, without more, do not establish a symbiotic relationship between a private entity and the state. In light of the Supreme Court's decisions, the continuing precedential value of *McQueen, Lopez,* and *Joy* is questionable, in part because it is not clear whether the state's involvement in those cases went beyond regulation and funding. Since this case is controlled by *Rendell-Baker* and *Blum,* the cases cited by plaintiff cannot be followed.

In addition, respect for the proper roles of state and federal courts in the federal system counsels against extending the three cases cited by plaintiff. The landlord-tenant relationship is a matter of state concern with disputes arising from that relationship traditionally being resolved in the state court system. The result of accepting plaintiff's argument would be to remove these disputes from state courts and arguably federalize landlord-tenant relations whenever the landlord is subject to state funding and regulation. This Court is unwilling to allow 42 U.S.C. § 1983 to become the vehicle for turning landlord-tenant disputes into federal cases. Thus, the Court declines to enlarge the holdings of *McQueen, Lopez,* and *Joy.*

### III. *Conclusion*

Because LSS did not engage in state action when it fired Edwards, summary judgment will be entered on plaintiff's federal claims under 42 U.S.C. § 1983. Plaintiff also alleges pendent state law claims for breach of contract and defamation. "Absent significant investment of time and resources in a particular case, ... the exercise of pendent jurisdiction is improper where the underlying federal claim is dismissed prior to a trial on the merits." *Thompson,* 567 F.Supp. at 1168 (citing *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). Because little time has been spent on the state law claims, and because, as counsel indicated at oral argument, an action is proceeding in state court on the state law claims, the Court will decline to exercise pendent jurisdiction and will dismiss the pendent claims.