Rosemary **SCHIER**

v.

**TEMPLE UNIVERSITY.**

**Civ. A. No. 82–3554.**

United States District Court,
E.D. Pennsylvania.

Jan. 13, 1984.

Mary D. Colins, Thomas F. Gehret, Philadelphia, Pa., for plaintiff.

Eleanor W. Myers, Helen Pudlin, Philadelphia, Pa., for defendant.

## BENCH OPINION [*]

LOUIS H. POLLAK, District Judge.

This is a case in which the plaintiff is suing Temple University for causes of action that sound in terms of sexual harassment leading to, according to plaintiff's allegations, her essentially coerced resignation from the staff of the Temple University Hospital. The complaint is based in the alternative on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., which is a federal legislative proscription of gender discrimination in hiring or in the terms of employment, and on section 1983 of Title 42 of the United States Code.

[*] The following is an edited copy of the transcript of a Bench Opinion delivered on December 8,

Section 1983 prohibits deprivations of constitutional rights and provides for actions at law to vindicate such deprivations imposed under color of law. And it is plaintiff's submission that gender discrimination in hiring or in the terms of employment, including as here alleged, sexual harassment, is constitutionally proscribed as well as legislatively proscribed.

There is no contest by the defendants that the allegations state substantively viable claims provided that, with respect to Title VII, the claim was timely filed; and with respect to the 1983 claim, that Temple University and those who operate under its aegis can be said to be operating under color of law.

The defendants have moved for summary judgment because they take issue both with the timeliness of the Title VII claim and with the constitutional sufficiency of the 1983 claim in that it is directed against an entity, Temple University, which denies that it operates under color of state law.

### A. Timeliness of the Title VII Complaint

We will consider first the timeliness of the Title VII claim. The question of timeliness stems from the fact that the filing by the plaintiff of her charge with the Equal Employment Opportunity Commission (EEOC), which is an obligatory predicate for bringing an action in a federal district court, was accomplished on the 299th day after the plaintiff's allegedly coerced departure from her employment at Temple University Hospital. A Title VII complaint must be filed within 180 days of the alleged violation in a state in which there is no state agency analogous to the EEOC which could consider a claim of this sort. In a state such as Pennsylvania where an appropriate state agency does exist, a complainant may be allowed up to 300 days in which to file a complaint with the EEOC. This additional time is granted by the statute in order to allow a complainant to resolve the matter through state-created channels. 42 U.S.C. § 2000e–5(e).

1983. This edited copy shall be regarded as the official Opinion.

There is now an accumulation of cases which make it plain that a filing with the *state* agency which occurs after the 240th day would be too late because under the complex relationship between the federal and state enforcement mechanisms, the state agency is to have 60 days in which to deal with a complaint prior to EEOC consideration. If the filing of the complaint with the state agency takes place on the 241st day, then the state agency's completion of the process could well lapse over beyond the 300th day. *See Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980).

Per contra, where, as here, an appropriate state agency is available but the complainant does not file with the state agency, then under the Third Circuit's recent decision in *Kocian v. Getty Refining and Marketing Co.,* 707 F.2d 748 (1983), a complaint filed with the EEOC on the 299th day is out of time. The reason for the rule in the *Kocian* case is that it places complainants in states with appropriate state agencies who do not file a complaint with the state agency on a par with complainants in states without such an agency.

The purpose behind the extended 300-day limitations period also supports Getty's position. In *Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980) the Supreme Court stated

> The [legislative] history identifies only one reason for treating workers in deferral States differently from workers in other States: to give state agencies an opportunity to redress the evil at which the federal legislation was aimed, and to avoid federal intervention unless its need was demonstrated.

*Id.* at 821, 100 S.Ct. at 2494. Here, the purpose in allowing the extended limitations period has not been served because the state agency had no opportunity to address Ms. Kocian's claim. To allow a Title VII litigant the benefit of the extended limitations period merely because she fortuitously works in a deferral state would ignore the plain language of the statute and its legislative purpose. 707 F.2d at 751.

Now, our plaintiff filed her EEOC complaint on the 299th day after the last alleged violation of Title VII so that she complied neither with the 240-day rule nor with the 180-day rule. Plaintiff's counsel acknowledges that this was an untimely filing. Therefore, the only issue before me relating to timeliness is whether the defendant is estopped from pleading the relevant statute of limitations by virtue of the doctrine of equitable tolling which is held to obtain with respect to Title VII actions under certain circumstances.

■ Equitable tolling, which our Court of Appeals has said must be meticulously monitored, is not a general *carte blanche* to allow complainants to file late. Equitable tolling comes into play in three principal, but not mutually exclusive, circumstances: 1) where there is a showing that the defendant has effectively misled the plaintiff in some active sense; 2) where the plaintiff has in "some extraordinary way" been precluded from asserting her or his rights; or 3) where the plaintiff made a timely submission but in the wrong forum. *Kocian,* 707 F.2d at 753.

■ Plaintiff's grounds for asserting this is a proper case for application of principles of equitable tolling are twofold: first, it is asserted that this record shows beyond a peradventure of a doubt that the plaintiff was misled by the defendant. Principal reliance here is on the plaintiff's assertion in her deposition that the defendant, through Mr. Miller, told her in the closing summer days of 1981, at the point when she was resigning from her position, that he would write a letter of recommendation for her, would rehire her and would keep his eyes open for other employment opportunities for her at the hospital.

Taking the plaintiff's assertion of what Mr. Miller said at its strongest, for the purposes of this motion, the proposition that the plaintiff was so misled by Mr. Miller's statements as to deter her from filing her charge with the EEOC during the next approximately six months (which would have brought her within the 180-day provision) is entirely unpersuasive.

There is no suggestion that Mr. Miller discussed with the plaintiff any legal claims she might have stemming from her resignation or her intent to vindicate such claims. Furthermore, there is no evidence that Mr. Miller directly discouraged her from pursuing those rights.

Other evidence submitted by plaintiff in response to this motion makes it clear that plaintiff was aware of how to file an EEOC complaint. She was aware of the importance of timely filing of the complaint since she had obtained information from the EEOC and had some knowledge of the process from her prior job in an employment office. Therefore, as in *Vuksta v. Bethlehem Steel Corp.*, 540 F.Supp. 1276 (E.D.Pa.1982), the statements allegedly made by defendant's agent are not sufficient to support the conclusion that equitable tolling applies here.

The contention that the plaintiff was prevented in "some extraordinary way" from timely assertion of her rights seems to depend on plaintiff's claim that she received erroneous guidance from the EEOC itself. She asserts that she called the EEOC in September of 1981 to find out how to proceed, and they told her that they would send her a brochure, which they did. The brochure she received said under the section entitled "Filing a Charge": "[Y]ou must file an employment discrimination charge within 180 days of the alleged discriminatory act. Where there is a State or Local Fair Employment Practice Agency in your area, you have up to 240 days, and in some cases you may have up to 300 days to file your charge with EEOC, but you should check with the Commission."

It cannot be asserted that this language in the brochure was a model of clarity, but it is not, on its face, a total misrepresentation. The first injunction was to file within 180 days. The second was, if you are in a state with an appropriate agency, you have up to 240 days. Further, in some cases, you may have up to 300 days, but check with the Commission.

Plaintiff asserts that because she was puzzled by the information in the brochure, she did call somebody at the Commission and was told that she had up to 300 days in which to file and that, ultimately, when she did file on the 299th day, her filing was accepted. Plaintiff argues that her late filing was due to her reasonable reliance upon these statements and actions by the EEOC.

The Third Circuit has noted, when faced with similar arguments, "That equitable tolling is particularly appropriate in cases involving 'lay persons unfamiliar with the complexities of administrative procedures.' We have distinguished those cases, however, from cases such as this one involving Title VII litigants who are represented by counsel." *Kocian*, 707 F.2d at 755.

In the present action, if plaintiff had shown that she was a novice as to the problems involved in filing employment discrimination claims and had only the advice of the agency as to the appropriate time for filing the complaint, equitable tolling might be warranted. But the evidence shows only that the plaintiff possessed more than average knowledge about the operating of anti-discrimination laws since she had dealt with such issues when she worked at an employment office before working at Temple University Hospital. Furthermore, it is apparent, from plaintiff's deposition, that she had retained an attorney before she filed her EEOC charge. At what point that legal representation commenced, one cannot tell from the record. However, from the evidence marshalled by plaintiff it is hard to see that plaintiff has shouldered her burden of showing that she has been precluded by the information received from the EEOC from effectively vindicating her rights.

Accordingly, I conclude that the filing under Title VII claim was tardy and that there are no grounds for forgiveness, and defendant is entitled to summary judgment on the Title VII claim.

### B. *State Action*

We turn now to the larger question which is presented by defendant's second ground for its motion for summary judgment. Defendant contends with respect to the § 1983 claim that Temple University is

not an entity whose activity is under color of state law. Furthermore defendant argues that personnel decisions made with respect to this plaintiff are not decisions which were encouraged or coerced by the Commonwealth of Pennsylvania or from which the Commonwealth in any way benefited.

Now, the question of the status of Temple and cognate institutions for § 1983 purposes is not a new one in this circuit. The question of the status of the University of Pittsburgh came before the Court of Appeals in *Braden v. University of Pittsburgh*, 552 F.2d 948 (1977). There the district court had dismissed a § 1983 proceeding against the University of Pittsburgh in which the complainant was a member of the University of Pittsburgh faculty who alleged that the university had discriminated against her and others in employment. The Court of Appeals reversed and remanded that case to the district court for findings of fact on the relationship between the University of Pittsburgh and the Commonwealth. On remand, after development of an extended record, the district court denied defendants' motion to dismiss. The Court of Appeals, en banc, speaking through Judge Adams, affirmed the decision that the University of Pittsburgh was, for the purposes of the motion, an entity whose alleged discrimination constituted state action within the meaning of the relevant doctrine surrounding § 1983.

It was while that case was in process that the question of Temple's status arose in this Court before Judge Higginbotham. *Isaacs v. Board of Trustees of Temple University*, 385 F.Supp. 473 (E.D.Pa.1974). Instructed by the initial remand in *Braden* which occurred in 1973, Judge Higginbotham developed a substantial factual record with respect to Temple's status. Judge Higginbotham's comprehensive opinion surveys not only the relevant law but the array of facts which were adduced on the record dealing with the relationship between Temple and the Commonwealth.

Some reference to Judge Higginbotham's findings and conclusions I think would be useful here. Judge Higginbotham traced how Temple, initially a private institution without any trace of formal connection with the Commonwealth, became, pursuant to 1965 legislation, Temple University—Commonwealth Act, Pa.Stat.Ann.Tit. 24, §§ 2510–1 to 2510–12 (Purdon Supp.1983), a so-called "state-related" university, a status quite similar to that of the University of Pittsburgh. The University of Pittsburgh, like Temple, had been a private institution. Both institutions ran into certain financial difficulties which apparently led both of them to welcome the courting of the Commonwealth.

From the Commonwealth's point of view, the recruiting of Temple and, analogously, the University of Pittsburgh into what the legislature called "the Commonwealth system of higher education" was found to be in the public interest of the people of Pennsylvania. Pa.Stat.Ann.Tit. 24, § 2510–2 (Purdon Supp.1983). The legislature found "that the Commonwealth of Pennsylvania recognizes Temple University as an integral part of a system of higher education in Pennsylvania, and that it is desirable and in the public interest to perpetuate and extend the relationship between the Commonwealth of Pennsylvania and Temple University for the purpose of improving and strengthening higher education by designating Temple University as a State-related university; therefore, it is hereby declared to be the purpose of this act to extend Commonwealth opportunities for higher education by establishing Temple University as an instrumentality of the Commonwealth to serve as a state-related institution in the Commonwealth system of higher education." § 2510–2(7).

The term "state-related institution" is in no sense a term of art. It reflects a closer association with the Commonwealth than that enjoyed by a group of enterprises of which the University of Pennsylvania is a significant example. Those "state-aided" institutions receive substantial infusions of state funds, but their structures have not been modified nor their operations subject to legislative regulation to the same degree as "state-related" institutions.

Further removed from the Commonwealth are institutions which have kept their academic gowns almost completely unsullied by contact with the Commonwealth. I think Swarthmore, Haverford and Bryn Mawr may be examples of that, although there has been no development of this on the record before me. Suffice it to say, there are certain institutions which do not receive formal appropriations of Commonwealth funds as a generalized mode of support, although they may be objects of particular grants or contractual relationships which are not relevant to the question here.

Closer to the core of the Commonwealth are at least two other sets of institutions. Penn State University, the details of whose structure and financial posture I am not familiar with is, as I understand it, closer to the total dominion of the Commonwealth than the University of Pittsburgh and Temple. Similarly, the state colleges are, in effect, as I understand it, under the close direction of the Secretary of Education.

Now, Temple pursuant to the 1965 legislation, had its charter amended to change the name of the institution to "Temple University of the Commonwealth System of Higher Education."

Its board of trustees was also restructured. There are now thirty-six voting members of the board pursuant to state legislation, plus three ex officio members of the board. The three ex officio members are the Mayor of the City of Philadelphia, the Governor, and the Superintendent of Public Instruction. Four members of the board of trustees are appointed by the Governor with the advice and consent of two-thirds of the Senate; four are appointed by the President pro tempore of the Senate; and four by the Speaker of the House. The legislation does not provide the mode of selecting the other twenty-four members of the board of trustees but does specify their terms. In the trustees is vested "the entire management, control and conduct of the instructional, administrative and financial affairs of the university." § 2510–5.

The university, under the governing legislation, is obliged to "maintain such tuition and fee schedules for Pennsylvania resident and non-Pennsylvania resident full-time students as are set forth annually in the act of the General Assembly which makes appropriations to Temple University." § 2510–6.

Furthermore, the legislation provides that the "benefits of all Commonwealth or Commonwealth authority programs for capital development and improvement shall be available to the university under terms and conditions comparable to those applicable to land grant institutions of higher learning and State colleges. In accordance with legislative appropriations made as provided by law, the Commonwealth may, by agreement with the board of trustees, acquire lands, erect and equip buildings, and provide facilities for the use of the university." § 2510–7. The reference to "land grant institutions" in § 2510–7, is a reference which, as I understand it, includes schools such as Penn State University.

The legislation also authorizes the board of trustees to issue bonds in the name of the university, and it is specified that those bonds "shall at all times be free from taxation within the Commonwealth of Pennsylvania." § 2510–9(c).

The president of the university is required annually to make a report on the affairs of the university to the trustees who are required to submit that report to the Governor and the General Assembly. § 2510–10.

The opinion in *Isaacs* describes the monies appropriated to Temple University from 1965 forward to 1972–3. Those sums rose from 23 percent to 33.7 percent of the university's operating income.

Judge Higginbotham reviewed these factors and many others in his opinion in *Isaacs* and looked at them through the prism of the Supreme Court's decision in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In that case the Supreme Court held that the Wilmington Parking Authority, an agency of the City of Wilmington,

hence, the State of Delaware, was constitutionally accountable for the racially discriminatory refusal of the Eagle Coffee Shop, which rented space from the Wilmington Parking Authority, to accept black patrons.

Certainly the "activities, obligations and responsibilities" of the Commonwealth are many and varied in the instant case. It has incorporated Temple into its own system of higher education. It has renamed Temple. Through its elected officials, it appoints one-third of Temple's Board of Trustees. It sets fee and tuition schedules for Temple's students and appropriates millions of dollars to Temple to enable the institution to maintain those schedules. It has funded a sizable portion of Temple's present capital development and plans to fund an overwhelming share of the institution's projected capital development. Through an extensive audit, it holds Temple accountable for the expenditure of the funds it has appropriated to the institution. It enjoys a right of review over Temple's budget generally. It has authorized Temple to issue tax-exempt bonds. Finally, it requires Temple's chief executive officer to file annual reports on all of the institutions affairs, "instructional, administrative and financial." In my judgment, the present record presents a picture of Commonwealth participation and involvement that is far more extensive than the "activities, obligations and responsibilities" of the parking authority that contributed to the result in *Burton.*

According to the Court, the unique relationship between the restaurant and the parking authority conferred on both, in addition to the normal consideration attendant upon any lessor-lessee relationship, "an incidental variety of mutual benefits." 365 U.S. at 724, 81 S.Ct. at 861. The great bulk of the mutual benefit in the instant case can scarcely be described as "incidental." They were clearly visualized by both parties beforehand and deliberately incorporated into the Act. Two major benefits accrue to the Commonwealth: through Temple, it is able to provide relatively inexpensive higher education for its residents in southeastern Pennsylvania; and, again through Temple, it is able to discharge that public responsibility at far less cost to itself than if it had to establish a similar institution on its own. 385 F.Supp. at 488–89.

Judge Higginbotham then discussed the benefits to Temple from its relationship to the Commonwealth and then said:

Justice Clark [in *Burton*] also noted "the obvious fact that the restaurant is operated as an integral part of a parking building devoted to a public parking service." An "obvious fact" in the instant case is the operating of Temple, since the passage of the Act, as an "integral part" of a public system of educational institutions, the Commonwealth system of higher education, which performs an indisputable public service.

In view of these facts and circumstances—the "activities, obligations and responsibilities" of the Commonwealth, the "benefits mutually conferred" on Temple and the Commonwealth by their relationship, and the "obvious fact" that Temple is an "integral part" of the Commonwealth system of higher education—I find that the *Burton* criteria for "state action" has been satisfied. 385 F.Supp. at 489.

Now, Judge Higginbotham's decision, which was not appealed and has not been disapproved by the Court of Appeals or the Supreme Court, would seem dispositive of the issue here. There is no suggestion that intervening circumstances in the last decade have reduced Temple's connection with or support from the Commonwealth. The only change during the intervening decade has been the evolution of state action doctrines in ways which have limited the authority of *Burton.*

The Third Circuit Court of Appeals has expressly recognized this as recently as July of this year when, in *Community Medical Center v. Emergency Medical Services of Northeastern Pennsylvania, Inc.,* 712 F.2d 878, Judge Adams said "As Judge Garth noted in dissent in *Braden v.*

University of Pittsburgh, 552 F.2d at 971–973, the recent authorities, while not repudiating the Burton and public function tests, have severely limited their applicability." 712 F.2d at 880.

Now, the recent authorities which Judge Adams in Community Medical Center found to be particularly important to current application of the Burton "symbiotic relationship" test were those very recent decisions of the Supreme Court in Blum v. Yaretsky, which is 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), and Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). In both cases, the Supreme Court declined to find that actions taken by institutions which were almost totally supported by state funds and which were subject to some measure of state regulation, were actions which could be regarded as under color of state law for § 1983 purposes.

In Blum v. Yaretsky, what was in question were nursing home decisions to transfer and discharge patients. In Rendell-Baker v. Kohn, what was at issue were allegedly discriminatory discharges of certain teachers and vocational counselors.

In Blum v. Yaretsky, the institution which the Court found not to be engaged in "state action" was a nursing home which received 90% of its funding from the state and was subject to significant state regulation. In Rendell-Baker v. Kohn, a school for the assistance of maladjusted students was found not to be involved in state action although almost all of the students of the school had been referred by state authorities and the school survived primarily on state funding.

Now, there can be little question that those decisions distinguish Burton and do so explicitly. In Blum v. Yaretsky, Justice Rehnquist stated: "We are unable to agree that the state is responsible for the decisions challenged by respondents. As we have previously held, privately-owned enterprises providing services that the state would not necessarily provide even though they are extensively regulated do not fall within the ambit of Burton." 102 S.Ct. at 2789.

In Rendell-Baker, Chief Justice Burger distinguished Burton on the facts. In Burton, the state profited financially from the discrimination while in Rendell-Baker it did not. "Here the school's fiscal relationship with the state is not different from that of many contractors performing services for the government. No symbiotic relationship such as exists in Burton exists here." 102 S.Ct. at 2772.

Now, if we contrast the institution involved in Rendell-Baker v. Kohn or the cognate "privately-owned enterprise" which Justice Rehnquist was discussing in Blum v. Yaretsky or, indeed, Emergency Medical Services of Northeastern Pennsylvania, the corporation considered by Judge Adams in Community Medical Services v. Emergency Medical Services, with Temple University, I suggest the analogies are attenuated. For example, the school in Rendell-Baker was described by the Chief Justice as follows: "Respondent Kohn is the Director of the New Perspective School, a nonprofit institution located on privately-owned property in Brookline, Massachusetts. The school was founded as a private institution and is operated by a board of directors, none of whom are public officials or are chosen by public officials." 102 S.Ct. at 2766.

Temple University, as structured by the Commonwealth Act of 1965, is not, as was the New Perspective School, "operated by a board of directors, none of whom are public officials or are chosen by public officials." Nor is Temple "located on privately-owned property." Temple is an institution which, as we have noted, is operated by a board, one-third of whose voting members are selected by the ranking public officials of the Commonwealth.

It is an institution which is heavily funded by the state although not to the degree that the school and the nursing home dealt with in Rendell-Baker and Blum v. Yaretsky received state funds. To be precise, in addition to the figures adduced by Judge Higginbotham, there is the finding by the Court of Appeals in Philadelphia National Bank v. United States, 666 F.2d 834

(1981), that the state's annual appropriations rose from 50.6 to 62.7 percent of the unrestricted revenue of Temple University between 1966 and '71 to '72. 666 F.2d at 836.

Perhaps more important is that "[D]uring the same period, the General State Authority of Pennsylvania built nine structures for Temple. Land for five of these was acquired in part by condemnation, and in four instances the Authority received the land by conveyance from the University. By 1971, the General State Authority owned 40 percent of Temple's physical plant." *Id.* Those factors and the other links between the Commonwealth and Temple make it particularly hard to accept a characterization of Temple University as analogous to "contractors performing services for the government." *Rendell-Baker,* 102 S.Ct. at 2772. This is an institution which was quite properly classified by Judge Higginbotham in *Isaacs* as a "hybrid." Temple constitutes a merger of great assets initially accumulated in the private sector with great assets and ever more accumulating assets from the public sector, it operates under a governing body which has an extraordinary infusion of persons selected to exercise a special public responsibility by the Governor, the Speaker and the President Pro Tempore of the Senate. The public responsibility that I speak of is the responsibility identified by the legislature in the Commonwealth Act of 1965 of extending and strengthening the Commonwealth system of higher education by making Temple University an "integral part of that system."

Whatever the shrinkage may be of the authority of *Burton,* it is apparent to me today, as it was apparent to Judge Higginbotham when he decided *Isaacs,* that the relationship between Temple University and the Commonwealth of Pennsylvania more than satisfies the demands of *Burton* for a "symbiotic relationship" which brings mutual benefit to the private as well as the public partner. Indeed, I would agree with Judge Higginbotham that the case for finding that the activities of Temple University are activities which comprehend state action is far stronger than the case for find-ing that the decision made by the Eagle Coffee Shop to exclude certain customers constituted "state action." The case is far stronger for the reason that the purposes for which Temple is operated pursuant to the concordat between the University and the Commonwealth, which matured in the legislation of 1965, are public purposes. That is to say, these are purposes of higher education, as contrasted with the private entrepreneurial purpose of serving coffee and donuts of Eagle Coffee Shop.

To characterize the work of Temple University as public is not to say that Swarthmore or Haverford or the University of Pennsylvania are engaged in public activity within the reach of the Constitution because they, too, are engaged in higher education. It is to say that higher education, indeed education generally, is one of the public functions as well as one of the private functions which is central to the operation of a democratic society. It is a service and a set of horizons that characterize the United States as a whole and each of our states.

Pennsylvania, like other states, compels its citizens when they are young to be educated for a period of years, and then, like every other state, provides public opportunities to be educated which supplement the private opportunities for higher education. These parallel educational systems have been in existence from the beginning of our nation. To characterize Temple University as engaged in public activity is to say that Temple, since the transformation of its structure by the legislation in 1965 and through the continuing appropriations of funds and addition of public structures, is engaged in the public activity of the state as the legislatively designated "instrumentality" of the Commonwealth of Pennsylvania.

What this means in my judgment is that Temple University meets the *Burton* standard of a mutually beneficial "symbiotic relationship." I make this determination despite the recognition that *Burton* is today, of more limited applicability than it once was. What remains of *Burton* is a

definition of state action which aptly applies to the case of the special institution which is Temple—a hybrid of some remaining private authorities, shored up and financially supported and undergirded physically by the real estate and buildings of the Commonwealth in the carrying forward of what the legislature determined to be a public function of highest consequence.

I conclude, in short, that the actions of Temple University are actions under color of law pursuant to *Burton.* I also conclude that they are under color of law independently of *Burton.* That is to say, I conclude that Temple University is sufficiently infused with the power of the state so that, in constitutional terms, it is what the legislature of Pennsylvania described it to be in statutory terms—an "instrumentality" of the Commonwealth.

It makes no difference in this analysis that Temple has been determined not to be a "political subdivision of the Commonwealth" for federal tax purposes. *Philadelphia National Bank v. United States,* 667 F.2d 834 (3rd Cir.1981). That decision dealt with a problem in interpretation of federal tax legislation. Such legislation does not purport to define the status of Temple University for purposes of the "state action" requirement of 42 U.S.C. § 1983.

Indeed, the Court of Appeals was careful to make that point. Judge Weis said of *Isaacs* and *Braden,* that such cases "which explore whether activities of state-related universities are 'state action' within the ambit of 42 U.S.C. § 1983, are of little assistance here. In those cases, the issue was whether a sufficient symbiotic relationship existed between the school and the Commonwealth so that there was liability for civil rights violations." 666 F.2d at 839.

In the same way, the decision by a divided Pennsylvania Supreme Court in *Mooney v. Board of Trustees of Temple,* 448 Pa. 424, 292 A.2d 395 (1972), that Temple University was not a "state agency" within the meaning of the Inspection and Copying Records Act of Pennsylvania is also not remotely pertinent to the constitutional considerations here.

In reaching these conclusions, I reject the proposition put forward by defendants that if state action is to be found here, it must be state action which connects officials of the Commonwealth directly to the particular discrimination which is challenged. I reject that conclusion because it is my constitutional determination that Temple University is, for the purposes of § 1983, an "instrumentality" of the state as substantially as Pennsylvania State University and the state colleges. Thus, the entirety of the actions or nonactions of Temple University is constrained by the 14th Amendment.

Ultimately, I think the issue which we face today must be examined in the light of the critical constitutional purposes which are at stake. To determine that Temple's status is similar to the status of the New Perspective School considered in *Rendell- · Baker v. Kohn,* is to accept Temple's claim that it is not different from "many contractors performing services for the government." This would dilute the importance of the undertaking of the Pennsylvania legislature in 1965 and the almost two decades of history since then in which there has been a strong and increasing commitment to the use of this great university as a part of the "Commonwealth system of higher education." I think what is evident here is that the Commonwealth of Pennsylvania, through its Legislature, through its Governor, through the highest officers of the Legislature, through its funds, and through its commitment of property has deemed as a matter of continuing public policy that Temple is a projection of the Commonwealth. And to that extent, the work Temple does on behalf of the people of Pennsylvania is public work, and it is public work which is shored up and at the same time constrained by the Constitution of the United States.

Accordingly, I will deny the defendant's motion for summary judgment with respect to the § 1983 claim and grant summary judgment with respect to the Title VII

claim. These actions will be reflected in a written Order.