S. Michael IMPERIALE, Jr., M.D.

v.

HAHNEMANN UNIVERSITY, Hahnemann University School of Medicine, and Board of Trustees of Hahnemann University; Alfred W. Martinelli; Allan J. Schwartz, M.D.; Harry Wollman, M.D.; and Iqbal F. Paroo.

Civ. A. No. 91–245.

United States District Court, E.D. Pennsylvania.

Oct. 7, 1991.

As Amended Oct. 31, 1991.

Michael J. McCaney, Jr., Gordon McCaney and Gordon, Philadelphia, Pa., James J. Kutz, Eckert, Seamans, Cherin & Mellott, Harrisburg, Pa., for plaintiff.

Thomas R. Mendieino, Christopher M. Arfaa, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendants.

## MEMORANDUM OF DECISION

SHAPIRO, District Judge.

### I. INTRODUCTION

Plaintiff S. Michael Imperiale, Jr., M.D., brought suit in the Court of Common Pleas of Philadelphia County against Hahnemann University ("Hahnemann") for wrongfully revoking his medical degree, *inter alia*, in violation of his constitutional rights, under 42 U.S.C. § 1983. Defendant removed this action under 28 U.S.C. § 1441(b) based on federal question jurisdiction; the section 1983 claim is the sole federal question presented by the pleadings.

Plaintiff received his medical degree from Hahnemann in June, 1987. Later that year, when he was a resident physician at Hahnemann University Hospital, defendants questioned plaintiff regarding whether he had successfully completed the first portion of a licensure examination ("Part I") administered by the National Board of Medical Examiners ("NBME"). Upon learning that plaintiff had not passed this examination, defendants directed plaintiff to take an immediate leave of absence from his position as a resident physician and present himself for disciplinary review. After several administrative hearings, defendant Hahnemann revoked plaintiff's medical degree.

Plaintiff claims that Hahnemann waived the requirement that each of its medical students successfully complete both parts of the exam. Defendant contends that successful completion of both Parts I and II of the NBME examination was a prerequisite to obtaining a medical degree. Furthermore, defendant contends that Hahnemann does not act under color of state law.

The court heard oral argument on the issue of whether Hahnemann was acting under color of state law, a requisite for 42 U.S.C. § 1983 liability. Defendants had argued that Hahnemann was not a state actor, but did not move for summary judgment on this ground. During oral argument, the court on its own motion but without objection of the parties severed and tried the issue of state action. The question now before the court is whether Hahnemann acted under color of state law when revoking plaintiff's medical degree.

The court makes the following uncontested findings of fact.

## II. FINDINGS OF FACT

1. Hahnemann is a non-profit corporation organized under the laws of the Commonwealth of Pennsylvania.

2. As a non-profit status corporation, Hahnemann does not pay taxes and is eligible to issue tax-exempt bonds. 26 U.S.C. § 501(c)(3).

3. Since 1921, Hahnemann has received an annual appropriation from the General Assembly of Pennsylvania.

4. The Commonwealth of Pennsylvania has declared that Hahnemann is "an essential source of higher education services for the residents of the Commonwealth" for which the Commonwealth "seeks to extend support." Plaintiff's App. 245.

5. Hahnemann supplies an annual "Budget Transmittal" request to the Department of Education requesting funding. The budget requests contain a "President's Statement" stating that "the allocation provided by the Commonwealth of Pennsylvania has been and will continue to be an essential source of financial support for the University. Full realization of the University's goals ... will be impossible without funding of the increase as requested." See 1988–89 President's Statement.

6. In its budget requests, the amount of funds requested constitutes approximately 20% of the medical school's "hard-core" operating instruction budget: these figures do not reflect the full necessary level of income.

7. Most members of Hahnemann's faculty are compensated not through payroll, but through faculty practice plans, where participating faculty maintain clinical offices on or near Hahnemann's campus and contribute 9% of their practice income to Hahnemann.

8. The Budget Transmittal requests do not reflect the compensation of faculty members generated by Hahnemann's faculty practice plan: if the full cost of faculty practice plans were included on Hahnemann's books, the total medical school budget would be approximately $100 million.

9. Hahnemann has received appropriations for the past five fiscal years earmarked for "instruction in the Doctor of Medicine program" in the following amounts: 1990—$5,210,000.00;

1989—$4,869.000.00;

1988—$4,615,000.00;

1987—$4,395,000.00;

1986—$4,146,000.00;

1985—$3,930,000.00.

Plaintiff's App. 324.

10. For the allied health, professional and graduate school, Hahnemann was appropriated the following amounts for the same period: $850,000.00; $702,000.00; $702,000.00; $454,000.00; $192,000.00; and $182,000.00. Plaintiff's App. 324.

11. As a condition to receipt of appropriations, Hahnemann must submit to the Commonwealth quarterly reports verifying how appropriated funds have been expended.

12. Hahnemann is deemed by the Commonwealth a state-aided institution of higher education.

13. To qualify for state-aided status and receive annual appropriations, Hahnemann must adopt a "statement of mission" con-

sistent with the policies of the State Board of Education, and must sign articles of agreement accepting the Board's policies and regulations, including disclosure of sources of income and expenditures and provision for equal opportunity. See 22 Pa.Code §§ 40.31, 40.33.

14. To be eligible for state-aided status, Hahnemann must provide the Department of Education with a description of its programs serving "the public interest and a need not presently being met by a state-supported institution"; it must demonstrate that it has undertaken measures in order to eliminate any "unnecessary duplicative programs." 22 Pa.Code § 40.33.

15. If Hahnemann fails to maintain required standards, the Secretary of Education is authorized to recommend to the General Assembly that no further appropriations be made. 22 Pa.Code § 40.53.

16. The Department of Education vests in Hahnemann the authority to grant degrees.

17. The degree-granting review and approval process of institutions such as Hahnemann is fully regulated and controlled by the state. See 22 Pa.Code § 31.1 (general provisions); § 32.1 et seq. (equal education opportunity); § 40.1 et seq. (institutional approval); and § 40.41 (evaluation for approval as a . . . University).

18. As a condition to receiving continued accreditation and state aid, defendants must supply catalogs to the Commonwealth, describing their procedures and "process" available to students within. See 22 Pa. § 31.32.

19. In addition to the Department of Education, the State Board of Medicine plays an integral role in review and approval of the curricula of the School of Medicine. 63 P.S. § 422.23.

20. Hahnemann is licensed to operate a hospital under authority granted by the Pennsylvania Department of Health.

21. Defendants interact with the Pennsylvania Department of Public Welfare regarding provision of indigent care and publicly funded Medicare and Medicaid programs; 55 Pa.Code §§ 1163.1–1163.501.

22. Over the last several years, approximately 37% of defendants' revenues for hospital care have been derived from Medicare and 14% from "Medicaid" funds. Plaintiff's App. 322.

23. Approximately 80% of Hahnemann students finance their education through grants or scholarships. Phillips Dep. at 91–92; App. 143–44; see also App. 323.

24. Hahnemann has received federal government Hill–Burton grant funds (42 U.S.C. § 291 et seq.) used to help finance capital improvements of Hahnemann's hospital in excess of $2.4 million dollars.

25. Over the years, Hahnemann has received millions of dollars in research fund grants.

26. The General Assembly of Pennsylvania has found it necessary and proper for the Commonwealth to assist institutions in providing educational facilities to accomplish the public benefit and good. It is often necessary for institutions such as Hahnemann to obtain short-term loans at considerable interest expense to provide necessary working capital.

27. The Pennsylvania Higher Educational Facilities Authority ("PHEFA") is a governmental instrumentality enacted for the purpose of providing financing to institutions of higher learning performing an essential government function on behalf of the Commonwealth. 24 P.S. §§ 5501–5517. The availability of short term revenue anticipation loans financed through PHEFA was designed to reduce interest expense, and to permit qualified institutions better to serve the interests of the Commonwealth.

28. Defendant qualifies as an institution authorized to participate in PHEFA financing.

29. The General State Authority ("GSA") is a governmental instrumentality whose purpose was designed, *inter alia,* to assist in financing improvements for Commonwealth-concerned interests. 71 P.S. § 1707.1 *et seq.*; § 1707.9b.

30. Although the deposition testimony of the Chief Financial Officer of Hahne-

mann and its Chief of Academic Affairs was inconclusive with regard to one or more areas concerning ownership of buildings and liabilities, it appears that of nine physical facilities comprising the defendant university, at least seven were initially constructed utilizing either GSA, PHEFA or the Hospital Authority of Pennsylvania ("THAP") financing.

31. The long-term debt utilized to construct Hahnemann's physical plant is comprised of State financing in the form of PHEFA grants, GSA financing, prior THAP financing, Commonwealth appropriations, Medicare and Medicaid payments, Burton grants, and other public funding.

32. As recently as 1989, through a series of PHEFA financings, revenue anticipation note issuances, and other bond financing, defendants consolidated and paid their entire long-term debt, except for two small publicly financed liabilities relating to GSA and an earlier PHEFA issuance.

33. Because of PHEFA financing, Hahnemann divested itself of a leasehold interest with THAP involving a bond issue to construct the North Tower (now commonly known as a portion of the hospital).

34. In 1989, PHEFA issued a $117,000,-000 unsecured loan to Hahnemann, a financial arrangement that would not otherwise be available through any reputable commercial lending institution.

35. Hahnemann has a total "long-term debt" of approximately $126,000,000, of which approximately $125,610,000 is owed to PHEFA or GSA; of this amount, PHEFA holds 98% of that long-term debt and GSA holds 2%.

36. At present, aside from a $390,000 debt for a computer, defendant does not owe commercial lending institutions any money.

37. GSA constructed several Hahnemann buildings and, to date, remains the underlying fee owner of both the Stiles Dormitory and the Health Sciences and Allied Health Building. When Hahnemann has repaid the debts secured by Stiles and the Health Sciences buildings, title will revert to it.

38. The total property insurance carried by Hahnemann on its physical facilities and entire inventory is in the amount of $217,-588,000.

39. In late 1989, Hahnemann underwent a "serious financial situation" which required a it to terminate over 100 individuals associated with the School of Medicine.

40. In the opinion of defendant Wollman, there is little expectation of increased donations and Hahnemann has continuing need for educational support, as tuition pays only 38% of the educational costs for the students in the Medical School.

41. Hahnemann provides valuable services for the state; educating Pennsylvania students, training doctors who practice in this state, providing tertiary care, performing significant research through sizable research grants, providing indigent care, and providing minority education programs.

42. The Dean of defendants' Medical School admits that Hahnemann "tilts" its acceptance policies towards Pennsylvania students in part because the Department of Education will be more favorably inclined to recommend legislative appropriations to Hahnemann.

43. The President of Hahnemann interacts with the Pennsylvania Department of Education, the Department of Health, the Department of Welfare, the Governor's office, and legislators to keep them informed and abreast of Hahnemann's progress and role, in part to obtain large appropriations.

44. Hahnemann regularly lobbies the Commonwealth of Pennsylvania and has two (2) individuals employed in the Government Relations Office of the University with an allocated annual budget of approximately one half million dollars.

45. Defendant Wollman acknowledges that he takes part in consultations with legislators at appropriate times in the annual appropriations process to respond to requests for information of the University or School of Medicine.

46. Wollman acknowledges that Hahnemann has an on-going dialogue with the Department of Education to discuss the needs of medical schools; their contribu-

tions to the economy of the Commonwealth; training of physicians for the state; care of the indigent population of the state; obtaining money from outside sources; impact on the local economy of the number of employees at defendants' institution; research programs; minority programs; and number of physicians remaining in Pennsylvania as well as physicians coming from out of state and remaining in Pennsylvania.

47. As a condition to application for medical licensure, an applicant must submit proof of receipt of an M.D. degree from an accredited institution. 63 P.S. § 421.1.

48. In 1987, the defendants considered the Department of Education experts in post-baccalaureate degree-granting, and contacted the Department of Education for guidance regarding the revocation of plaintiff's degree.

49. In early December, 1987, Defendant Alan J. Schwartz, Associate Dean for Academic Affairs of the School of Medicine, contacted Warren Evans, Ph.D., Chief of Post–Secondary Education, Department of Education, for advice regarding degree revocation.

50. Evans advised Schwartz:

... Your basic question dealt with the revoking of a degree awarded by and approved degree-granting institution in the Commonwealth ...

Hahnemann University derives its degree-granting power from its articles of incorporation. They were most recently approved by the Secretary of Education on

... The applicable section ... states, "to award all appropriate degrees and diplomas certifying the attainment of education standards, both earned and honorary degrees ...

As for your first or basic question, I indicated to you the last time this question came up was back in 1971. To that time there has been no precedent in Pennsylvania for an institution to revoke a degree. To my knowledge, this still holds true for Pennsylvania (as you know, however, there are at least five cases that have happened since that time

elsewhere). The advice given the particular institution in 1971 was: "The language concerning breach of contracts intimates that theoretically an institution could revoke a degree under ideal conditions, these being: (1) fraudulent contract (deception by the student); (2) early search by the institution revealed fraud (admissions); (3) charges brought within a reasonable time by the institution; and (4) no third party involved." At the time it was stated to the institution that "the chances for it accomplishing its intention would be slim, however, since the burden on the institution is heavy and since the courts tended to favor the individual against the institution or organization.

In 1971, it was stressed ... that at no time would or should the Department of Education become involved in the situation; whatever was done between the institution and the graduate. During our phone conversation I made the same comment to you ...

Plaintiff's App. 193–96.

51. Defendants also sought the advice of the Chairman and Chief Counsel for the State Board of Medicine, the entity controlling licensure of medical doctors in the Commonwealth.

## III. DISCUSSION

 Plaintiff claims relief under 42 U.S.C. § 1983 for violations of his constitutional rights protected against state violative action by the 14th Amendment. A plaintiff cannot recover under a section 1983 claim unless the defendant was acting under color of state law. The doctrine of "state action" preserves a tenuous balance between individual rights and governmental accountability. The fifth and fourteenth amendments protect individuals from government action: in order for an individual to obtain relief for violation of these constitutional protections, the alleged constitutional violations must be "fairly attributable to the state." *Krynicky v. Univ. of Pittsburgh*, 742 F.2d 94, 97 (3d Cir.1984), *cert. denied*, 471 U.S. 1015, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985); *quoting Lugar v. Edmondson Oil*, 457 U.S. 922,

937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). Challenged activity under section 1983 must be taken "under color of state law": this requirement is synonymous with the fourteenth amendment "state action" requirement, limiting the reach of federal law and judicial power by refusing to impose responsibility on the state when it cannot fairly be held accountable. *Community Medical Center v. Emergency Medical Services, Inc.*, 712 F.2d 878, 879 (3d Cir.1983), *quoting Lugar, supra* 457 U.S. at 936, 102 S.Ct. at 2753; *see also U.S. v. Price*, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). Mr. Imperiale cannot recover on his section 1983 claim unless Hahnemann was acting under color of state law.

■ The Supreme Court has not developed a unitary test for ascertaining when state action exists. *See Krynicky, supra* at 98. The facts of each case determine the test. *See Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725–26, 81 S.Ct. 856, 861–62, 6 L.Ed.2d 45 (1961). Here, the symbiotic relationship test and the nexus test are relevant in determining whether this university was a state actor. *Cf. Krynicky, supra* at 98.

A. *Symbiotic Relationship Test*

Plaintiff relies most heavily on the symbiotic relationship test of *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In *Burton*, the Supreme Court held the Wilmington Parking Authority constitutionally accountable for racial discrimination of Eagle Coffee Shop, a lessee of the Parking Authority. The Parking Authority was an agency of the City of Wilmington and the state of Delaware. The Court held that state action was present when:

> The State has so far insinuated itself into a position of interdependence with ... [the acting party] that it must be recognized as a joint participant in the challenged activity, which, on that account,

cannot be considered to have been so purely private as to fall without the scope of the Fourteenth Amendment. *Id.* at 725, 81 S.Ct. at 862.

■ In applying *Burton,* state regulation alone, even pervasive, extensive, and detailed regulation, will not render the actions of an institution attributable to the state; significant involvement is a predicate to state action. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 358–59, 95 S.Ct. 449, 457–58, 42 L.Ed.2d 477 (1974) (holding private utility not state actor despite extensive state regulation); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176–77, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627 (1972) (holding private club not state actor despite pervasive and detailed state regulations).

A trilogy of Supreme Court decisions in 1982 curtailing *Burton* (the *"Lugar* trilogy"), must be considered in evaluating whether or not there is state action. Two cases, finding no state action under the symbiotic relationship, clarify that neither extensive financial assistance nor routine state regulation constitute state action. *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).[1]

In *Rendell–Baker v. Kohn*, the New Perspectives School for maladjusted students was held not a state actor even though almost all its students had been referred by city school committees or state drug rehabilitation programs; their tuition was paid from state funds. The school had to comply with various state regulations, including administrative record-keeping requirements, for state tuition funding eligibility. *Rendell–Baker, supra* 457 U.S. at 833, 102 S.Ct. at 2767. Applying the nexus test of *Jackson (see infra )*, the Court held that the school did not meet the symbiotic relationship test of *Burton:*

> In *Burton,* the Court held that the refusal of a restaurant located in a public

1. *Lugar v. Edmondson Oil,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), the third case in the 1982 trilogy, did not address the symbiotic relationship test. However, as noted in *Kryn-* *icky, Lugar* cited *Burton* in a footnote without any suggestion that it was overruled. *Krynicky,* at 100, *citing Lugar,* 457 U.S. at 938 n. 19, 102 S.Ct. at 2754 n. 19.

parking garage to serve Negroes constituted state action. The Court stressed that the restaurant was located on public property and that the rent from the restaurant contributed to the support of the garage ... the Court concluded that ... the State profited from the restaurant's discriminatory conduct. The Court viewed this as support for the conclusion that the State should be charged with the discriminatory actions. Here the school's fiscal relationship with the State is not different from that of many contractors performing services for the government. No symbiotic relationship such as existed in *Burton* exists here. *Rendell–Baker, supra* 457 U.S. at 842–43, 102 S.Ct. at 2772.

In *Blum v. Yaretsky,* a nursing home received 90% of its funding from the state and was subject to significant state regulation, but was also held not a state actor. The Court, refusing to hold the state accountable for the challenged decisions to transfer and release patients, ruled that "privately-owned enterprises providing services that the state would not necessarily provide even though they are extensively regulated do not fall within the ambit of *Burton*." *Id.* 457 U.S. at 1011, 102 S.Ct. at 2789.

While the *Lugar* trilogy limited *Burton*'s symbiotic relationship theory, the doctrine has not been overruled. Both the Supreme Court and the Third Circuit have reaffirmed its vitality when the appropriate state-private relationship is present. The inquiry is thus highly fact-intensive.

### 1. Third Circuit Decisions

Prior to the *Lugar* trilogy, the Court of Appeals for the Third Circuit held that the University of Pittsburgh ("Pitt") was a state actor; its holding was based on the University of Pittsburgh–Commonwealth Act, a legislative enactment classifying the University of Pittsburgh ("Pitt") as a state-related institution and part of the Commonwealth System of Higher Education. *Bra-*

*den v. Univ. of Pittsburgh,* 552 F.2d 948 (3d Cir.1977).

In 1984, the Court of Appeals revisited this issue to determine whether *Braden* had been effectively overruled. Cases involving Temple University ("Temple") and the Pitt (together, the "Universities") were consolidated on appeal. *Schier v. Temple University,* 576 F.Supp. 1569 (E.D.Pa.) (J. Pollak); *aff'd sub nom. Krynicky v. University of Pittsburgh,* 742 F.2d 94 (3d Cir. 1984), *cert. denied,* 471 U.S. 1015, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985); *Krynicky v. University of Pittsburgh,* 563 F.Supp. 788 (W.D.Pa.1983), *rev'd,* 742 F.2d 94 (3d Cir. 1984), *cert. denied,* 471 U.S. 1015, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985). In *Krynicky,* the court held that *Braden* had not been overruled, and that Temple and Pitt were both state actors. The court's analysis of state action with regard to a university guides the resolution of this case.

The Court of Appeals focused its analysis on the statutes creating and defining the State's relationship with Pitt and Temple. Pa.Stat.Ann. tit. 24, §§ 2510–1 to 11 (Temple University–Commonwealth Act), Pa.Stat.Ann. tit. 24, §§ 2510–201 to 211 (University of Pittsburgh–Commonwealth Act) (collectively, the "Acts").[2] The Acts evidenced sufficient linkage to satisfy the symbiotic relationship test. *Krynicky, supra* at 101.

The comprehensive legislation established an interdependent relationship between the Universities and the Commonwealth. The Commonwealth conditioned its "massive infusion of moneys on a comprehensive restructuring of the University to reflect the needs of the Commonwealth." *Braden, supra* at 959. In return, the newly named Universities "of the Commonwealth System of Higher Education" obviated the need for the creation of additional state colleges. *Krynicky, supra* at 101. Significantly, the legislature declared its intent to establish Pitt and Temple as *instrumentalities* of the Commonwealth. *Krynicky, supra* at 101.

---

**2.** The court, noting that the statutes were virtually identical, confined its discussion to the Uni-

versity of Pittsburgh–Commonwealth Act.

## 2. State–Related Institutions

By virtue of the Acts, both Temple and Pitt are designated by the Pennsylvania legislature as "state-related" institutions. Pa.Stat.Ann. tit. 24, § 2510–202(6). The Acts provide that annual appropriations will be made to both Temple and Pitt, to be used as specified by the state. *Id.* at §§ 2510–206, –207; *Krynicky, supra* at 102. Regulation of the Universities' fiscal and other affairs is stringent. *Braden, supra* at 960. Under the Act, the Auditor General can audit the use of state funds and disallow any "improper expenditures" and also is empowered to review all expenditures of non-state funds. *Id.; Krynicky, supra* at 102.

The Acts provide that one-third of both Temple's and Pitt's board of trustees are selected by the Commonwealth. The Governor, the Mayor (of Pittsburgh and Philadelphia, respectively), and the Superintendent of the Department of Public Instruction are trustees *ex officio.* Pa.Stat.Ann. tit. 24, § 2510–204(a). Of the members appointed by the State, four are appointed by the Governor with advise and consent of the Senate, four by the President *pro tempore* of Senate, and four by the Speaker of the House. *Id.* at § 2510–204(b).

Temple and Pitt are statutorily obliged to maintain tuition and fee schedules for Pennsylvania residents as set forth annually by act of the General Assembly. *Id.* at § 2510–206. The Acts also provide that the respective Presidents of Temple and Pitt must file annual reports of all activities, "instructional, administrative, and financial," which will be transmitted to the Governor and the legislature. *Id.* at § 2510–207.

The Acts create a state tax exemption for income derived from bonds issued by Temple and Pitt and loans secured by its mortgages. *Id.* at 2510–209. Additionally, they entitle Temple and Pitt to benefit from all Commonwealth programs for capital development and improvement, under the same terms as land grant institutions (such as Penn. State). *Id.* at § 2510–208; *Schier, supra* at 1574. The Commonwealth may acquire lands, erect and equip buildings, and provide facilities for the use of these universities. The district court in *Schier* found that the General State Authority ("GSA") built 9 structures for Temple, and land for 5 was obtained by condemnation. *Id.* at 1577.

These facts made Temple and Pitt state actors, not because of the magnitude of the funds they received, but because of the comprehensive and affirmative legislative enactments accepting responsibility for these institutions. *Krynicky, supra* at 102.

### 3. Hahnemann University [3]

■ The symbiotic relationship test requires that the plaintiff allege significant state involvement with Hahnemann beyond state funding and regulation.

In the case of Hahnemann, there is no statute forming the predicate for state action. *Krynicky's* focus on the statutes linking the Universities and the state provides a useful framework for analysis: however, *Burton* mandates a fact-intensive analysis by the federal court, not mere acquiescence to the state legislature's characterization of an institution. As *Burton* cautioned, state action "can only be determined in the framework of the peculiar facts of circumstances present." *Burton, supra* 365 U.S. at 725–26, 81 S.Ct. at 861–62. Therefore, our analysis does not end with the determination that no statute governs.

The factors discussed in *Krynicky* are appropriate to measure state involvement with Hahnemann, even in the absence of an applicable statute. The analysis is consistent with *Burton* and its progeny and leads to the conclusion that Hahnemann's relationship with Pennsylvania does not satisfy the symbiotic relationship test.

In sharp contrast to Temple and Pitt, Hahnemann is a state-aided, not a state-

---

**3.** In *Sament v. Hahnemann Medical College and Hospital of Philadelphia,* 413 F.Supp. 434 (E.D.Pa.1976), the court found that Hahnemann was not a state actor, but subsequent Supreme Court and Third Circuit evolution of the state action doctrine makes review appropriate.

related institution. The distinction is significant. As Judge Pollak noted in *Schier:*

> The term "state-related institution" is in no sense a term of art. It reflects a *closer association* with the Commonwealth than that enjoyed by a group of enterprises of which the University of Pennsylvania is a significant example. Those "state-aided" institutions receive substantial infusions of state funds, but their structures have not been modified nor their operations subject to legislative regulation to the same degree as "state-related" institutions.

576 F.Supp. at 1573 (emphasis added).

The Commonwealth has made no statutory commitment of future appropriations to Hahnemann. Annual appropriations have been made since 1921, but the General Assembly is under no obligation to continue appropriations, despite Hahnemann's admitted reliance on such funds.[4] Hahnemann has not been the subject of pervasive regulation of its internal admissions and operations. In accordance with the Department of Education's requirements to qualify for state-aided status and receipt of designated appropriations, Hahnemann must maintain certain standards, adopt a mission statement, and sign articles of agreement with the Department. 22 Pa. Code § 40.31 *et seq.;* Plaintiff's App. at 59. Neither the receipt of state funds nor the conditions appended to them require the Commonwealth's extensive involvement with Hahnemann. Hahnemann has undergone no massive restructuring to meet Commonwealth specifications; plaintiff's analogies to *Krynicky* are inapposite.

*Rendell–Baker* is instructive: the New Perspectives School received almost all its students from public schools and drug rehabilitation programs and virtually all its funding from the state. In return, the school had to comply with state regulations, yet state action was not present.

The state's receipt of benefits does not alter this outcome. The state derived benefit from the continued operation of the school in *Rendell–Baker,* just as the Commonwealth concededly derives benefits from Hahnemann's continued operation. In both cases, this mutual benefit does not constitute symbiosis under *Burton. Rendell–Baker* analogized such regulation and mutual benefit to the state's relationship with an independent contractor, where "the school's fiscal relationship with the state is not different from that of many contractors performing services for the government." *Rendell–Baker,* 457 U.S. at 843, 102 S.Ct. at 2772; *Schier, supra* at 1576.

Unlike Temple and Pitt, Hahnemann retains the autonomy of a private institution operating in a state-regulated field. Hahnemann sets its own tuition and fee schedules and is not required to conform to those set by the General Assembly. The Commonwealth does not require Hahnemann to matriculate or maintain any number or percentage of Pennsylvania residents either as a condition to appropriations or as a prerequisite for assistance by the Pennsylvania Higher Educational Facilities Authority ("PHEFA"). Hahnemann "tilts" its admissions policy to favor Pennsylvania residents, but it does so voluntarily.

Hahnemann is privately governed. Not a single member of its governing Board of Trustees is appointed or designated by public officials, no public official serves on the Board. The governance of the University is again analogous to the New Perspectives School in *Rendell–Baker,* and distinguishable from Temple and Pitt in *Krynicky.*

Plaintiff relies on the Commonwealth's involvement in financing and constructing several Hahnemann buildings. In *Burton,* the complete intermingling of the state and private entities was evidenced not only by

---

4. State appropriations are clearly of great importance to Hahnemann. Plaintiff argues that state action is established by Hahnemann's alleged dependence on state funds, and the Commonwealth's resulting "stranglehold" on the institution. This theory relies on *Rackin v. Univ. of Penn.,* 386 F.Supp. 992 (E.D.Pa.1974), where the court applied that theory and held that the

University of Pennsylvania was a state actor. It is this court's view that *Rackin* does not retain vitality in light of the subsequent *Lugar* trilogy. Additionally, the post-*Rackin,* pre-*Lugar* opinion in *Sament v. Hahnemann Medical College and Hospital of Philadelphia,* 413 F.Supp. 434 (E.D.Pa.1976), concluded that Hahnemann was not a state actor.

the State's deriving benefit from the Eagle Coffee Shop's business, but also by the fact the alleged state actor was located in a building owned and operated by the state. In *Krynicky*, the Court of Appeals stated that "it is apparent from [*Burton*] that this second factor is at least as important as the financial relationship." *Krynicky* at 101.

Characterizing Hahnemann's buildings as state-owned property is misleading. Hahnemann holds unencumbered title to five of its nine buildings. Hahnemann has obtained building funds from tax-exempt bond issues through PHEFA, but Hahnemann must repay its debt with interest. Lease arrangements with PHEFA and GSA secure portions of this indebtedness; Hahnemann will receive title to the leased premises when the debt is repaid. The Health Sciences & Allied Health Building and the Stiles Dormitory are collateral for a PHEFA bond issue. The New College Building and Klahr Building are held by the state to secure GSA financing. When these debts are repaid, title reverts to Hahnemann.

Plaintiff also relies on Hahnemann's extensive efforts to maintain interactions with legislators, state agencies, and the Governor. Concededly, Hahnemann expends considerable time and resources on what can broadly be classified as lobbying. If lobbying were a predicate to state action, the actions of virtually every interest group in the state would be attributable to Pennsylvania. Such an approach does not relate to the state's involvement with Hahnemann; that is the proper state action inquiry, not the scope of Hahnemann's lobbying efforts.

Upon consideration of the facts submitted, the relationship between the Commonwealth and Hahnemann is insufficient to establish state action under the symbiotic relationship test.

B. *Close Nexus Test*

■ Imperiale also advances a "close nexus" theory of state action. In contrast to the symbiotic relationship test and its focus on the entire relationship between Hahnemann and the Commonwealth, the close nexus approach focuses on whether the Commonwealth can be deemed responsible for specific conduct, i.e., revoking Imperiale's medical degree. *See Community Med. Center v. Emergency Med. Services*, 712 F.2d 878, 881 (3d Cir.1983), *citing Blum, supra*. Both *Blum* and *Rendell–Baker* explicitly hold that specific responsibility cannot be inferred from a private party's participation in public contracts, heavy regulation, or even the "indirect involvement" by the state in the challenged decision. *Community Med. Center, supra* at 881.

No state statute or regulation was cited that was pertinent to the revocation of Imperiale's degree. Defendant Dr. Alan J. Schwartz, Associate Dean for Academic Affairs at the School of Medicine, did call Mr. Warren Evans, Accreditation Specialist of the Department of Education, for professional guidance regarding degree revocation. Mr. Warren responded by a letter stating there was no controlling precedent in Pennsylvania. Warren relayed the advice, given in response to the same question in 1971, that revocation of a degree would be difficult and then stated "at no time would or should the Department of Education become involved in the situation; whatever was done was *between the institution and the graduate*." (emphasis added) Plaintiff's App. at 193–94.

The Department of Education neither exercised coercive power nor significantly encouraged Hahnemann regarding the revocation of the Imperiale degree; indeed, it affirmatively disclaimed responsibility for the decision. *See Blum, supra* 457 U.S. at 1004, 102 S.Ct. at 2785–86. Whether justified or not, Hahnemann's ultimate decision to revoke plaintiff's degree turned on "judgments made by private parties according to professional standards that are not established by the state." *Blum, supra* at 1008, 102 S.Ct. at 2788; *see also Albert v. Carovano*, 851 F.2d 561, 571 (2d Cir.1988) (en banc) (state statute requiring college to file disciplinary rules did not compel enforcement and disciplinary action taken by private college was not state action).

The Commonwealth's involvement with Hahnemann does not qualify as state action under the close nexus test.

### C. *State Law Claims*

Under the applicable symbiotic relationship and close nexus tests, Hahnemann was not acting under color of state law as required by section 1983. Plaintiff cannot recover on his section 1983 claim.

 Having denied liability as to the sole federal claim presented, the court recognizes that litigation of the state claims is still in a relatively early stage. This case was removed to federal court on January 14, 1991, but by Order entered March 13, 1991 following a pre-trial conference, the court severed and stayed the plaintiff's pendent state claims. The case proceeded only on the federal claim. Neither party will be prejudiced by returning to state court, and remaining claims do not involve issues of federal policy. Therefore, the court declines to retain supplemental jurisdiction over plaintiff's state law claims. 28 U.S.C. § 1367(c)(3) (Supp.1991). Because this action was removed to federal court, the court in its discretion remands the remaining state law claims to state court. *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 357, 108 S.Ct. 614, 622, 98 L.Ed.2d 720 (1988); *cf.* Practice Commentary at 224, 28 U.S.C.A. § 1367 (Supp.1991).

Any facts in this Discussion section not found in the Facts section are incorporated by reference therein.

## IV. CONCLUSIONS OF LAW

1. Hahnemann was not acting under color of state law as required by 42 U.S.C. § 1983.

2. Plaintiff's section 1983 claim fails for lack of state action.

3. Removal to this federal court under 28 U.S.C. § 1441 was based solely on the federal question presented by the section 1983 claim.

4. Having determined the federal claim against the plaintiff, the court declines to exercise supplemental jurisdiction over plaintiff's remaining state claims. 28 U.S.C. § 1367(c)(3).

5. This case is remanded to state court under 28 U.S.C. § 1447. *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).